422 So.2d 884 (1982)
Milton F. STEINHARDT and Gladys Goldman, As Trustee, Appellants,
v.
Milton RUDOLPH and Hilda Rudolph, His Wife, et al., Appellees.
Milton RUDOLPH and Hilda Rudolph, His Wife, et al., Appellants,
v.
Milton F. STEINHARDT and Gladys Goldman, As Trustee, Appellees.
Nos. 80-957, 80-2527.
District Court of Appeal of Florida, Third District.
August 17, 1982.
Rehearing Denied December 28, 1982.
*886 Blackwell, Walker, Gray, Powers, Flick & Hoehl and James C. Blecke, Miami, for Milton F. Steinhardt and Gladys Goldman.
Michael L. Hyman and Andrew D. Kaplan, Miami, for Milton Rudolph and Hilda Rudolph.
Before HUBBART, C.J., and BARKDULL and DANIEL S. PEARSON, JJ.
HUBBART, Chief Judge.
The central issue presented by these consolidated appeals is whether a certain rent escalation clause, tied to the Consumer Price Index and the anticipated eventuality of a dollar devaluation, contained in the 99-year ground lease of condominium property in this case is unenforceable in futuro as being unconscionable under Florida contracts law. We conclude that the trial court was correct, based on this record, in finding that this lease provision was unconscionable and in refusing to enforce same in futuro; we further find no error in the other findings of the trial court attacked on this appeal. The final orders appealed from are, accordingly, affirmed in all respects.

I
The facts relevant to the central issue herein presented are as follows. Between 1965-70, Mr. Milton F. Steinhardt, the defendant-developer in this case, acquired a tract of land located in Dade County, Florida. He proceeded to develop this land by constructing a condominium complex later named Eastern Shores White House Condominium with 119 individual apartment units. As a means of selling these individual units under the condominium form of ownership, Mr. Steinhardt set up a land trust with respect to the land on which the condominium project was built. Mr. Steinhardt named as trustee of the trust his employee, the defendant Gladys Goldman; he named as beneficiaries of the trust himself and several members of his family: Rafael Steinhardt, Esta Steinhardt and Joan Dunphy. It is undisputed that Mr. Steinhardt controlled this land trust and that Gladys Goldman took her orders directly from Mr. Steinhardt.
As a further means of selling the individual condominium units, Mr. Steinhardt, on March 2, 1970, entered into a nominal lease of the land on which the condominium was situated with the nominal trustee of the land, the defendant Gladys Goldman. By the terms of this lease, Gladys Goldman purported to lease this land to Mr. Steinhardt with express provisions therein that Mr. Steinhardt would assign his interest, as lessee of the land, to the individual condominium unit owners upon the sale of said units. Under the terms of the lease, the individual unit owners, as assignees of the nominal lessee, Mr. Steinhardt, were required to pay the cost of extensive insurance, real estate taxes, repair expenses, and all other conceivable expenses arising from the operation of the underlying property; the nominal trustee-lessor Gladys Goldman and the real owner Mr. Steinhardt were not required to assume any responsibility with respect to the expenses, upkeep or management of the land.
The lease further provided for an annual rental rate [$51,480.] to be paid pro rata by the individual condominium unit owners as assignees of the nominal lessee, Mr. Steinhardt. This rental rate, in turn, was subject to a double escalation clause. First, the lease provided that the rental rate would be adjusted upward periodically based on a formula directly tied to the Consumer Price Index; the rental rate, however, could never be reduced downward in the event of a fall in the Consumer Price Index. Second, the lease provided for an *887 additional escalation of the rental rate in the event the dollar was ever devaluated, said escalation to be in direct proportion to the amount of the devaluation.[1] A lien *888 against the individual unit owner's apartment was created upon failure to pay this rent when due.
Mr. Steinhardt, in turn, sold all of the individual condominium units, together with an assignment of the above-stated ground lease, to each of the 119 condominium unit owners at Eastern Shores White House Condominium and filed the required declaration of condominium on the project. In so doing, it appears that Mr. Steinhardt's salespeople urged the individual unit owners not to engage an attorney to represent them in their respective transactions as they were led to believe that counsel would be provided for them. The unit owners, as a consequence, did not engage counsel on their individual transactions, but were represented, so they thought, by Mr. Rafael Steinhardt, who, unbeknownst to them, was one of the nominal beneficiaries of the land trust which ostensibly benefited from the lease. Mr. Rafael Steinhardt, however, did not, in fact, represent any of the unit owners on their respective closings herein, but instead, represented solely the developer, Milton Steinhardt; indeed, Rafael Steinhardt drew up all the land trust, lease and condominium documents involved in the entire project as counsel for Milton Steinhardt.[2]
As part of the sales transactions in this case, a complex series of documents were supplied to each of the unit owners in a so-called Blue Book, which included the subject lease document. There is evidence, however, that these documents were supplied to a number of the unit owners either at or after their respective closings. At any rate, the unit owners apparently relied on their "counsel" to protect their interests and, it is asserted, were unaware of the content or meaning of the double escalation clause in the lease as discussed above. This clause, critical to the instant case, has since been enforced to steadily increase the rent paid by the individual unit owners to lease the ground on which the subject condominium is situated.
On March 25, 1975, Eastern Shores White House Association, Inc. filed, on behalf of itself and all of its individual unit owners, as a class, a multi-count complaint against Milton Steinhardt and Gladys Goldman seeking in Count IV to restrain the enforcement of the double escalation clause in the ground lease agreement based on a theory of unconscionability.[3] A second complaint was later filed by Milton and Hilda Rudolph, et al., as individual unit owners, both *889 for themselves individually and as representatives of the class of all condominium unit owners in the Eastern Shores White House Condominium; two counts were set forth in the second complaint, not relevant here, one attacking the double escalation clause[4] and the other questioning the landlord's title to the property. Appropriate answers were filed to these complaints, and both causes were, in turn, consolidated for a single disposition and trial.
On January 14, 1980, the cause came on for non-jury trial in the court below on all issues save certain damage claims. At that time, testimony was adduced establishing the above-stated facts. The trial court subsequently entered a final judgment declaring the double rent escalation clause unconscionable and unenforceable from and after February 12, 1980  the date of a post-trial hearing at which the parties preliminarily agreed to enter into a stipulation of settlement. The trial court also entered a subsequent final order finding for the defendants on the remaining two counts of the amended complaint which questioned the title of the landlord in the lease premises and attacked the double escalation clause on grounds as stated above. The defendants Steinhardt and Goldman appeal the former ruling; the plaintiff unit owners appeal the latter ruling.

II
The law in Florida is clear that an unconscionable contract or an unconscionable term therein will not be enforced by a court of equity. "It seems to be established by the authorities that where it is perfectly plain to the court that one party [to a contract] has overreached the other and has gained an unjust and undeserved advantage which it would be inequitable to permit him to enforce, that a court of equity will not hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness." Peacock Hotel, Inc. v. Shipman, 103 Fla. 633, 138 So. 44, 46 (1931). Stated differently, "[i]f a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." Restatement (Second) of Contracts § 208 (1979); see also § 672.302, Fla. Stat. (1981). At common law, an unconscionable, and thus unenforceable, contract or term therein was defined as one which "[n]o man in his senses and not one under delusion would make on the one hand, and as no honest and fair man would accept on the other." Hume v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889), quoting from Earl of Chesterfield v. Janssen, 28 Eng.Rep. 82, 100 (1750). In a more modern context, "`[m]ost courts take a `balancing approach' to the unconscionability question, and to tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability.'" Kohl v. Bay Colony Club Condominium, Inc., 398 So.2d 865, 868 (Fla. 4th DCA), pet. for review denied, 408 So.2d 1094 (Fla. 1981), citing with approval J. White & R. Summers, Uniform Commercial Code 128 (1972). Procedural unconscionability focuses on those factors surrounding the entering of the contract which add up to an absence of meaningful choice on the part of one of the parties to the contract as to the terms therein; substantive unconscionability, on the other hand, focuses directly on those terms of the contract itself which amount to an outrageous degree of unfairness to the same contracting party. See e.g., Kohl v. Bay Colony Club Condominium, Inc., supra, at 867-68 and authorities collected.
This procedural-substantive analysis is, however, only a general approach to the unconscionability question and is not a rule of law. For example, the Florida decisions concerning unconscionability as applied to a mortgage foreclosure case are entirely devoid of this analysis. See, e.g., New England *890 Mutual Life Insurance Co. v. Luxury Home Builders, Inc., 311 So.2d 160 (Fla. 3d DCA 1975); Clark v. Lachenmeier, 237 So.2d 583 (Fla. 2d DCA 1970); Althouse v. Kenney, 182 So.2d 270 (Fla. 2d DCA 1966); Koschorek v. Fischer, 145 So.2d 755 (Fla. 2d DCA 1962); Lieberbaum v. Surfcomber Hotel Corp., 122 So.2d 28 (Fla. 3d DCA 1960). Moreover, the Restatement (Second) of Contracts § 208 (1979) does not even attempt to define unconscionability in a black letter rule of law, whether in procedural-substantive terms or otherwise, because the legal concept involved here is so flexible and chameleon-like. Still, we regard the procedural-substantive analysis as generally helpful and note that it has been employed in past cases in analyzing the asserted unconscionability of long-term condominium leases. See e.g., Bennett v. Behring Corp., 466 F. Supp. 689 (S.D.Fla. 1979); Kohl v. Bay Colony Club Condominium, Inc., supra. We, accordingly, apply it in this case.
All of this does not mean, however, that a court will relieve a party of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him. Indeed, the entire law of contracts, as well as the commercial value of contractual arrangements, would be substantially undermined if parties could back out of their contractual undertakings on that basis. "`People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.'" 14 S. Williston, A Treatise on the Law of Contracts § 1632 at 51-52 (3d ed. Jaeger 1972), quoting with approval from Carlson v. Hamilton, 8 Utah 2d 272, 332 P.2d 989, 990-91 (1958). This principle of unconscionability is, we think, an important, if infrequently used, safety valve in our law of contracts because "courts should be enabled to refuse enforcement of a contract ... when such enforcement would not be in keeping with the basic function of any court  the administration of justice." Murray, Unconscionability: Unconscionability, 31 U.Pitt.L.Rev. 1, 2 (1969).
We deal today with a typical long term 99-year condominium lease, here a ground lease, established by a condominium developer as part of a sales package for selling the individual condominium units. In recent years, these leases have come under increasing judicial and legislative scrutiny for their asserted unfairness to the individual unit owners. It is now recognized that a cause of action sounding in unconscionability lies against the enforceability of such leases. Avila South Condominium Ass'n v. Kappa Corp., 347 So.2d 599, 605 (Fla. 1977); Cole v. Angora Enterprises, Inc., 370 So.2d 1227 (Fla. 4th DCA 1979); Burleigh House Condominium, Inc. v. Buchwald, 368 So.2d 1316, 1317-18 (Fla. 3d DCA), cert. denied, 379 So.2d 203 (Fla. 1979); Point East One Condominium Corp. v. Point East Developers, Inc., 348 So.2d 32, 36 (Fla.3d DCA 1977). Several other causes of action, not relevant here, have also been recognized by the courts as a means of attacking these same leases. Avila South Condominium Ass'n v. Kappa Corp., 347 So.2d 599 (Fla. 1977). To facilitate the bringing of these actions, the Florida Supreme Court has specifically adopted a rule of civil procedure [Fla.R.Civ.P. 1.220(b), now renumbered Fla.R.Civ.P. 1.221] allowing individual condominium unit owners as a class to attack the lawfulness, including the unconscionability, of such leases in a single class action. Avila South Condominium Ass'n v. Kappa Corp., supra at 608; Kohl v. Bay Colony Club Condominium, Inc., 398 So.2d at 869 (Fla. 4th DCA 1981). Moreover, individual Florida Supreme Court Justices have, in separate opinions, *891 strongly criticized these leases and developer practices associated therewith. Avila South Condominium Ass'n v. Kappa Corp., supra at 609-10 (England, C.J., concurring in part; dissenting in part); Point East Management Corp. v. Point East One Condominium Corp., 282 So.2d 628, 630-34 (Fla. 1973) (Ervin, Boyd, JJ., dissenting), cert. denied, 415 U.S. 921, 94 S.Ct. 1421, 39 L.Ed.2d 476 (1974); Fountainview Ass'n v. Bell, 214 So.2d 609, 609-14 (Fla. 1968) (Ervin, Roberts, JJ., dissenting).
The Florida Legislature, in turn, has also been quite critical concerning the over-all fairness of many of these condominium leases:
"The Legislature expressly finds that many leases involving use of recreational or other common facilities by residents of condominiums were entered into by parties wholly representative of the interests of a condominium developer at a time when the condominium unit owners not only did not control the administration of their condominium, but also had little or no voice in such administration. Such leases often contain numerous obligations on the part of either or both a condominium association and condominium unit owners with relatively few obligations on the part of the lessor. Such leases may or may not be unconscionable in any given case. Nevertheless, the Legislature finds that a combination of certain onerous obligations and circumstances warrants the establishment of a rebuttable presumption of unconscionability of certain leases... ." § 718.122(2), Fla. Stat. (1981).
These onerous obligations and circumstances are, in turn, set out in Section 718.122(1), Florida Statutes (1981), and, when all are present, render a "recreational or other common facilities" condominium lease presumptively unconscionable "irrespective of the date on which such lease was entered into... ." § 718.122(1), Fla. Stat. (1981).
One clause frequently contained in these condominium leases is, as here, a so-called escalation clause which "provides that the rental under the lease ... shall increase at the same percentage rate as any nationally recognized and conveniently available commodity or consumer price index." § 718.401(8)(a), Fla. Stat. (1981). This clause has by statute been prospectively declared "void" as against Florida public policy and may no longer be included or enforced in any lease which, unlike here, was entered into subsequent to the effective date of the statute. § 718.401(8)(a), Fla. Stat. (1981); Fleeman v. Case, 342 So.2d 815 (Fla. 1976). Even so, the courts have applied the statute to leases existing at the time that the statute became effective where, unlike this case, the declaration of condominium specifically adopts the Florida Condominium Act and all future amendments thereto. Kaufman v. Shere, 347 So.2d 627 (Fla. 3d DCA 1977), cert. denied, 355 So.2d 517 (Fla. 1978); see also Century Village, Inc. v. Wellington E, F, K, L, H, J, M & G, Condominium Ass'n, 361 So.2d 128 (Fla. 1978); Sandalfoot South One, Inc. v. Sandalfoot Cove Country Club, Inc., 404 So.2d 752 (Fla. 4th DCA 1981); Cole v. Angora Enterprises, Inc., 403 So.2d 1010 (Fla. 4th DCA 1981); Coral Isle East Condominium v. Snyder, 395 So.2d 1204 (Fla. 3d DCA), pet. for review denied, 407 So.2d 1105 (Fla. 1981); Golden Glades Club Recreation Corp. v. Association of Golden Glades Condominium Club, Inc., 385 So.2d 103 (Fla. 3d DCA), pet. for rev. denied, 392 So.2d 1374 (Fla. 1980). Kaufman and its progeny illustrate, once again, the willingness of Florida courts to void onerous terms in such leases in appropriate circumstances. In sum, then, many of these long term condominium leases have come under sharp judicial and legislative attack in recent years for their gross unfairness to the individual unit owners, a factor we consider highly relevant in determining whether a particular lease, in appropriate circumstances, may be unenforceable, either in whole or in part, as being unconscionable under Florida contracts law.

III
We now turn to a consideration of whether the continued enforcement of the *892 double escalation of rent clause contained in the 99-year condominium ground lease in the instant case was barred as being unconscionable under Florida contracts law. Here we have no trouble in concluding that the trial court was well within its discretion, based on this record, in finding that the continued enforcement of this clause was, indeed, so barred as being contractually unconscionable. We must, accordingly, reject the defendants Steinhardt and Goldman's contentions to the contrary on this appeal.

A
The factors indicating procedural unconscionability in this case are manifest based on the record before us. The individual condominium unit owners had, in our view, no real meaningful choice in accepting the double escalation of rent clause or, indeed, any other clause contained in the subject ground lease.

1
First, the subject lease was solely negotiated and executed by the developer Steinhardt and his employee, the nominal land trustee Goldman, who, concededly, took orders directly from the developer Steinhardt. The individual condominium unit owners in no sense had any voice as to any of the terms included in the subject lease, including the double escalation of rent clause. This avowed self-dealing by the developer must, therefore, be considered a factor  truly a powerful one  of procedural unconscionability under Florida contracts law. Indeed, this factor has already been recognized as an indicia of unconscionability when applied to other related long-term condominium leases. See e.g., § 718.122(1)(a), Fla. Stat. (1981).

2
Second, the individual unit owners were, in effect, required to become assignees of the developer Steinhardt's "tenancy" in the subject ground lease as a precondition for buying their individual condominium units; they could not, for example, buy their condominium units and decline to become tenants on the subject lease. Given the great need for, and the admitted scarcity of, housing units in this state  and, indeed, in this nation  the meaningful choice of the unit owners as to whether to accept the lease in question was a decidedly minimal one. As such, the lease was akin to a contract of adhesion long condemned under our law, and the corresponding impact on the unit owners' choice here must be considered one factor of procedural unconscionability under Florida contracts law. See e.g., Point East Management Corp. v. Point East One Condominium Corp., 282 So.2d 628, 630-34 (Fla. 1973) (Ervin, Boyd, JJ., dissenting), cert. denied, 415 U.S. 921, 94 S.Ct. 1421, 39 L.Ed.2d 476 (1974); Fluor Western, Inc. v. G & H Offshore Towing Co., 447 F.2d 35, 39 (5th Cir.1971) (en banc), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972); Bolgar, The Contract of Adhesion: A Comparison of Theory and Practice, 20 Am.J.Comp. 53 (1972).

3
Third, the sales people of the developer in this case urged the individual unit owners not to obtain their own counsel for their respective closings on the sale of the individual condominium units. As a result, the unit owners did not obtain counsel for their individual closings and were under the impression that they had counsel protecting their interests supplied by the developer. That counsel, however, was, in fact, representing solely the developer Steinhardt at these closings. Indeed, this lawyer, Rafael Steinhardt, had drawn up all of the legal documents involved in this condominium project, including the subject lease, and was also a nominal beneficiary of the land trust who ostensibly benefited from the subject lease. The documents, including the subject lease, were not even supplied to many of the individual unit owners until at or after their respective closings. This entire course of conduct had the effect of depriving the individual unit owners of any real knowledge of what they were getting into when they technically agreed to become assignees of the developer Steinhardt's leasehold on the subject lease. Again, we deal with a powerful procedural unconscionability factor under Florida contracts law.

*893 B
The substantive unconscionability factors in this case are even more abundant when one focuses on the actual terms in the subject lease, including the double escalation of rent clause. This lease was, without doubt, a one-sided developer's lease containing exceptionally onerous terms for the individual unit owners.

1
First, the double escalation of rent clause is tied to both the Consumer Price Index and any possible dollar devaluation with one important catch: only a rise in rents is authorized here, not a reduction  even though the Consumer Price Index falls or the dollar is legally appreciated in value. This double escalation of rent clause was made effective for the entire life (99 years) of the lease. In sum, the developer Steinhardt, by the terms of this lease, is entirely protected on rent collections for nearly a century from the vicissitudes of inflation and recession, while the individual unit owners are entirely at the mercy of these economic forces; even if the market should drop out and the dollar be devaluated, the unit owners must, nonetheless, pay an inflated price for greatly devalued land. Surely, we deal here with substantive unconscionability factors of the first magnitude under Florida contracts law. Indeed, these factors have already been recognized, in part, as indicia of common law unconscionability when applied to other related long-term condominium leases. See e.g., § 718.122(1)(e)(h), Fla. Stat. (1981). Moreover, the legislature has deemed the subject rent escalation clause, in itself, void as against Florida public policy when applied, unlike this case, to leases entered into subsequent to the effective date of the statute, § 718.401(8)(a), Fla. Stat. (1981); Fleeman v. Case, 342 So.2d 815 (Fla. 1976). This gives added weight, we think, to our conclusion that the rent escalation clause should be, at least, one indicia of substantive unconscionability under Florida contracts law when applied to any condominium lease including the lease in the instant case.

2
Secondly, the subject lease imposes upon the individual condominium unit owners the duty of paying the real estates taxes, the insurance costs, and all maintenance expenses and obligations with respect to the leased land. The developer Steinhardt through his nominal trustee Goldman has no cost or maintenance obligation whatever with reference to the lease; his sole duty under the lease is to accept rents. As the lease lasts for nearly a century, the cost obligations imposed on the individual unit owners are truly staggering while the developer has no cost or management obligations at all. These indicia, without doubt, are powerful factors of substantive unconscionability under Florida contracts law. Indeed, such factors have already been recognized as indicia of common law unconscionability when applied to other related long-term condominium leases. See e.g., § 718.122(1)(b)(c)(d), Fla. Stat. (1981). Moreover, it is clear that all the above terms, when accompanied by a rent escalation clause, as here, are sufficient in themselves to place the lease under a cloud of suspect unconscionability based on Florida contracts law. Kohl v. Bay Colony Club Condominium, Inc., supra at 869.

3
Third, the "benefit" obtained by the individual unit owners by the subject lease is almost non-existent. The unit owners receive the right to "enjoy" the land on which their condominium is situated. While this is a technical benefit, it is a minimal one at best as the leasehold interest held by the individual unit owners clearly has no real economic value by itself in the open market. Surely, no buyer would be remotely interested in purchasing the individual unit owner's tenancy herein (apart from the individual condominium unit) for the privilege of "enjoying" land on which the subject condominium building is situated. The leasehold interest of the individual unit owners is, therefore, for all intents and purposes, inalienable by itself, and the individual unit owners, like it or not, are saddled with paying rent thereon for the entire 99-year *894 life of the lease or for so long as they own their individual condominium unit. Moreover, the saleability of their individual condominium unit is considerably reduced when combined with the sale of said lease as the terms of the lease are so onerous; this is particularly true where, as here, the unit owners are competing in a market where no new leases may contain the subject cost of living escalation clause. § 718.401(8)(a), Fla. Stat. (1981).

4
Fourth, the subject lease specifically provides that a lien may be imposed on the individual apartment unit for the failure of the unit owner to pay his share of the rent under the lease. The developer, then, is totally protected against non-payment of rent at the expense of the unit owners' interests. We deal again with a substantive unconscionability factor under Florida contracts law which has already been adopted when applied to other related long-term condominium leases. See e.g., § 718.122(1)(f), Fla. Stat. (1981).

C
Putting all the above-stated procedural and substantive unconscionability factors together, we have no trouble whatever in concluding that, at the very least, the continued enforcement of the double escalation of rent clause in the subject lease was unconscionable, and classically so, under Florida contracts law. The individual unit owners, by this lease, are saddled with a 99-year commitment to lease the land on which their condominium is situated. As this tenancy has virtually no economic value on the open market and is tantamount to being inalienable in itself, the lease, in effect, locks the unit owners into paying rent for the entire 99-year life of the lease or for as long as they own their individual unit. Moreover, the saleability of their individual unit is considerably reduced because of the lease. The unit owners, in addition, are required to pay an annual rental for this land of $51,480, which, in turn, escalates as the Consumer Price Index rises, but does not decrease when the same Index falls; the rent further escalates in the event of a dollar devaluation. The unit owners are also required to bear all the expenses connected with the upkeep and management of the land, to wit: real estate taxes, insurance, and any and all maintenance expenses. A lien is placed on the individual condominium units in the event that a unit owner's share of the rent is not paid under the lease. The developer Mr. Steinhardt, on the other hand, bears no responsibility whatever under the lease, save that of collecting rent.
The lease, in turn, was negotiated, in effect, solely by the developer himself, with the unit owners having no voice whatever as to any of its terms. The lease was, in addition, made a precondition to the sale of the individual units making it akin to an adhesion sale. And, finally, the entire lease transaction was hidden, in part, under a smoke screen wherein the developer successfully urged the unit owners not to obtain lawyers to protect their rights in their respective closings, withheld in part the legal papers associated with the transaction, and had a lawyer at the individual closings who represented solely the developer's own interests.
It is difficult, in our view, to imagine a lease with more procedural and substantive indicia of unconscionability than the lease we examine in the instant case. Surely "[n]o man in his senses and not one under delusion would make [such a lease] on the one hand, and ... no honest and fair man would accept [such a lease] on the other." Hume v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889), quoting from Earl of Chesterfield v. Janssen, 28 Eng.Rep. 82, 100 (1750). Without doubt, "one party [the developer Steinhardt] has overreached the other [the individual condominium unit owners] and has gained an unjust and undeserved advantage which it would be inequitable to permit him to enforce," Peacock Hotel, Inc. v. Shipman, 103 Fla. 633, 138 So. 44, 46 (1931), as "`no decent, fairminded person would view the ensuing result [here] without being possessed of a profound sense of injustice... .'" 14 S. Williston, A Treatise on *895 the Law of Contracts § 1632 at 52 (3d ed. Jaeger 1972), quoting with approval from Carlson v. Hamilton, 8 Utah 2d 272, 332 P.2d 989, 990-991 (1958). Indeed, we think the quantum of procedural and substantive unconscionability in this case is so great that the entire lease, or at least the double escalation of rent clause, was, in all likelihood, unenforceable from its very inception. The trial court, however, did not void the entire lease and, indeed, did not even void the double escalation of rent clause from its inception. Instead, the trial court imposed a very modest remedy which was to prohibit the enforcement of the double escalation of rent clause, in futuro, from a date immediately subsequent to the trial herein. Under all the circumstances, we think this remedy was well within the discretion of the trial court to impose. We, accordingly, have no difficulty in affirming the aforesaid ruling of the trial court as being amply supported by substantial, competent evidence in this record.

IV
We turn now to the appeal taken by the individual unit owners attacking two of the findings made by the trial court below. We find no merit in this appeal. First, it is clear that the declaration of condominium in this case does not adopt future amendments of the Florida Condominium Act, and, as such, Kaufman v. Shere, supra, is inapplicable to this case. Second, we are unimpressed with the individual unit owners attack on the landlord's title to the leased land in this case as "it is a well-established rule that lessees are estopped from denying their lessors' title, during the existence of the relationship of landlord and tenant." Avila South Condominium Ass'n v. Kappa Corp., 347 So.2d at 603 (Fla. 1976); in this connection, we are persuaded that Ackerman v. Spring Lake of Broward, Inc., 260 So.2d 264 (Fla. 4th DCA 1972), has no more vitality in view of the Avila South decision of the Florida Supreme Court. The final orders under review in this cause are, therefore, in all respects
Affirmed.

ON REHEARING
PER CURIAM.
The defendants Steinhardt and Goldman have filed a motion for rehearing in which they urge for the first time on appeal[1] that the double escalation of rent clause contained in the condominium ground lease herein permits a reduction in rentals due under the lease in the event of a fall in the consumer price index and therefor cannot be considered, as we have held, a factor of substantive unconscionability under Florida contracts law. We cannot agree.
By the terms of the subject clause, the basic rental rate of $51,480 a year due under the lease can never be reduced no matter how far the consumer price index might fall; the rentals can only increase on a periodic basis from this basic rental rate. True, these rent increases might arguably be erased by a subsequent fall in the consumer price index,[2] but the basic rental rate could never be reduced no matter how depressed the economy might become. In addition, the rentals are subject to a proportionate increase in the event of a dollar *896 devaluation  irrespective of any movement in the consumer price index. Under any view of this lease, then, the developer is fully protected for nearly a century against the vicissitudes of inflation and depression  while the individual unit owners are left entirely at the mercy of these economic forces. We deal here, as we have held, with substantive unconscionability factors of the first magnitude under Florida contracts law.
We have considered this and all other points raised on the subject motion for rehearing and find them to be without merit. The motion for rehearing is, therefore, denied.
NOTES
[1] The rent escalation clause provides as follows:

"C. In view of the fluctuating purchasing power of the dollar, the parties hereto, desiring to adjust the above described rentals to such purchasing power, agree that adjustments shall be made in the annual rental from time to time as hereinafter provided so as to reflect as nearly as possible such fluctuations. The parties hereto adopt as standard for measuring such fluctuations the Consumer Price Index (revised using the 1957-1959 average as equal to 100), United States average on all items and commodity groups issued by the Bureau of Labor Statistics of the United States Department of Labor, hereinafter referred to as the "Index". The average of the Index for the months of June, July, and August, 1970, shall be taken as the Basic Standard. The average of the Index for those months was 135.6, and that figure is therefore the Basic Standard as that term is hereinafter used. The first adjustment shall be made in the year 1974 so that it will operate for the next five-year period commencing on the 1st day of April, 1975. Thereafter, for the remainder of the term, adjustments shall be made every five years and shall be in effect to the next five-year period. These adjustments shall be made and the rental for the ensuing period shall be arrived at by multiplying the rent of FIFTY ONE THOUSAND FOUR HUNDRED EIGHTY DOLLARS ($51,480.00) by a fraction, the numerator of which shall be the new Index figure and the denominator of which shall be the Basic Standard. The new Index figure will be the average for the months of June, July, and August of the Lease year prior to that in which the adjustment is made. For example, the new Index figure shall be taken from the months of June, July, and August, 1974, and would be utilized for the purpose of recomputing the rentals commencing the 1st day of April, 1975, and thereafter at the end of each five-year period.
It is understood that the above Index is now being published by the Bureau of Labor Statistics of the United States Department of Labor, monthly. Should it be published at other intervals so that the three months' average cannot be determined exactly as above contemplated for the Basic Standard, then the Basic Standard shall be arrived at from the Index or Indices published by said Bureau most closely approximating such three months' interval. Should said Bureau of Labor Statistics change the manner of computing such Index, the Bureau shall be requested to furnish a conversion factor designed to adjust the new Index to the one previously in use, and the adjustment to the new Index shall be made on the basis of such conversion factor. Should the publication of said Index be discontinued by said Bureau of Labor Statistics, then such other Index as may be published by such Bureau most nearly approaching said discontinued Index shall be used in making the adjustments herein provided for. Should said Bureau discontinue the publication of an Index approximating the Index herein contemplated, then such Index as may be published by another United States Government Agency as most nearly approximates the Index herein first above referred to shall govern and be substituted as the Index to be used, subject to the application of an appropriate conversion factor to be furnished by the government agency publishing the adopted Index. If such governmental agency will not furnish such conversion factor, then the parties shall agree upon a conversion factor or a new Index and, in the event agreement cannot be reached as to such conversion factor or such new Index, then the parties hereto agree to submit to arbitration, chosen in accordance with the Rules of the American Arbitration Association, the selection of a new Index approximating as nearly as can be the Index hereinabove first contemplated, which new Index may be the one published by a governmental agency or one published by a private agency and generally accepted and approved as an Index reflecting the contemplated fluctuation in the purchasing power of the dollar. Should there be no such publication by a governmental agency, then an Index prepared by a private agency generally accepted and approved as an Index reflecting the contemplated fluctuation in the purchasing power of the dollar shall be agreed upon by the parties hereto, or failing such an agreement, a generally accepted and approved Index shall be selected by arbitrators in accordance with the Rules of the American Arbitration Association. The selection of an Index by such arbitrators in either of the above events shall be binding upon the parties hereto. In no event shall the basic rental payable to the Lessor decrease below FIFTY ONE THOUSAND FOUR HUNDRED EIGHTY DOLLARS ($51,480.00), which is the basic rental payable under this Lease.
In the event of any controversy arising as to the proper adjustment for rental payments as herein provided, the Lessee shall continue paying the rental under the last preceding rental adjustment as herein provided until such time as said controversy has been settled, at which time an adjustment will be made retroactive to the beginning of the adjustment period in which the controversy arise[sic].
In addition to the foregoing paragraph providing for the increase of the rental covered by this Lease due to price fluctuations, it is agreed that in the event the United States dollar should ever be officially devaluated by the United States Government, or replaced by a legal specie of a lesser value, then and in that event the rental to be paid by the Lessee to the Lessor shall be increased in proportion to said devaluation so that the rental, including any increase by reason of fluctuations in the Consumer Price Index, will be equal to the value of the United States dollar as of the date of the execution of this Lease.
* * * * * *
29. DEVALUATION: In the event that the United States Dollar should ever be officially devalued by the United States Government or replaced by a regular specie of a lesser value, then and in that event the rental to be paid by the Lessee to the Lessor or any purchase price to be paid to the Lessor by the Lessee shall be increased in proportion to said devaluation so that the rental to be paid to the Lessor or the purchase price of the property covered by this Lease to be paid to the Lessor, shall be the same in terms of actual value as the United States Dollar was on March 2, 1970."
[2] Mr. Rafael Steinhardt testified below that he was unaware of the asserted deception practiced by the developer's salespeople and that to date he has received no income as a nominal beneficiary of the subject land trust. There has, accordingly, been no contention raised here that counsel was guilty of any professional improprieties.
[3] An additional count [Count V], not relevant here, also attacks the double escalation clause as being void under Section 711.231 Florida Statutes (1975). The trial court dismissed this count and this dismissal was affirmed on appeal. Eastern Shores White House Ass'n v. Steinhardt, 347 So.2d 788 (Fla. 3d DCA 1977). This count was repled in a subsequently filed complaint and was tried below resulting in a judgment for the defendants herein. The plaintiffs have appealed this ruling. For reasons developed later, we find no error in this decision of the trial court.
[4] See footnote 3, supra.
[1] On the contrary, the defendants argued in their main brief that "cost of living index adjustment clauses," such as found in the subject lease, have been universally upheld, and are a "recognized method for determining rental increases in a long term lease." (Appellant's main brief, pp. 14, 15). In addition, the defendants in both their main brief and reply brief frequently refer to the subject rent provision as an "escalation clause." (Appellant's main brief, pp. 4, 11, 13, 18; Appellant's reply brief, pp. 3, 5, 6, 7, 12).
[2] The complex rental adjustment formula based on the cost of living index as provided in the double escalation of rent clause herein appears to support this result  although the lease inconsistently provides elsewhere that the entire clause is one "providing for the increase of the rental covered by this Lease due to price fluctuations." [emphasis added]. It is therefore open to argument whether the lease provides for any reductions in lease rental payments; indeed, the defendants in both their main brief and reply brief have made arguments which implicitly assume that only rent increases are permitted under the subject rent clause. See note 1, supra.