## JONES, et ux., et al. v THOMAS, et ux., et al.
### Case No. 84-442
Ninth Judicial Circuit, Osceola County

January 16, 1986

**OPINION OF THE COURT**

ROM W. POWELL, Circuit Judge.

### *AMENDED FINAL JUDGMENT*

On March 21, 1984, plaintiffs, all tenants of a mobile home park, filed suit against defendants, Arthur and Shirley Thomas, his wife, owners of the park, and Friendly Adult Estates, Inc., the corporate lessee and operator of the park. The original complaint contained multiple counts. Later, plaintiffs' motion to establish a class action was granted. By order dated July 9, 1985, all but two claims were dismissed without prejudice and the previous order establishing a class action was reafirrmed. A repleader was required as to the two viable claims: (1) unconscionability of a proposed increase in the rental for each lot from $102.50 per month to $130.00 per month, and (2) damages for alleged breach of statutory obligations by the park owners and operators.

Defendants filed an answer containing a general denial and a motion to dismiss for failure to state a cause of action. The first claim was tried without jury on October 10, 11, and 21-24, 1985. Jury trial on Claim (2) was recently taken off the trial docket by mutual consent of the parties and neither party has requested that it be re-set for trial as of this date.

As recognized many times throughout by the lawyers, the parties and the court, this case has been extremely difficult and perplexing because of the repeal of certain portions of Ch. 83, Florida Statutes (1983); subsequent enactment of Ch. 723, Florida Statutes (1984); the multiple claims advanced by plaintiffs; the class nature of the action; the elusive concept of "unconscionability", and the paucity of clear decisional precedent.

Section 723.033, Florida Statutes (1984) and its predecessor, § 83.754, Florida Statutes (1983), authorize the court to refuse to enforce or to limit the application of any unconscionable provision of a mobile home lot rental agreement. The Florida Supreme Court in an early case has referred to an unconscionable agreement in another context as "one in which it is perfectly plain to the court that one party has overreached the other and has gained an unjust and undeserved advantage which it would be inequitable for him to enforce." *Peacock Hotel, Inc. v. Shipman*, 138 So. 44, 46 (Fla. 1931). Modernly it has been said that "[m]ost courts taking a 'balancing approach' to the unconscionability question, and to tip the scales in favor of unconscionability, . . . seem to require a certain quantum of procedural unconscionability plus a certain quantum of substantive unconscionability." *Kohl v. Bay Colony Club Condominium, etc.*, 398 So.2d 865, 868 (Fla. 4th DCA 19), pet. for review denied 408 So.2d 1094 (Fla. 1981). This procedural-substantive analysis is only a general approach and is not a rule of law. *Steinhardt v. Rudolph*, 422 So.2d 884 (Fla. 3d DCA 1982). "Procedural unconscionability focuses on those factors surrounding the entering of the contract which add up to the absence of a meaningful choice on the part of one of the parties . . . substantive unconscionability . . . focuses directly on those terms of the contract itself which amount to an outrageous degree of unfairness to the same contracting party." *Steinhardt*, supra, at p. 889.

The Florida Supreme Court appears to recognize that, almost as a matter of law, a mobile home owner shows procedural unconscionability because the burden of moving his mobile home or buying another one in another park leaves him with an absence of meaningful choice when faced with an unconscionable rental agreement. See *Palm Beach*

**31**

*Mobile Home, Inc. v. Strong*, 300 So.2d 881 (Fla. 1974); *Steward v. Green*, 300 So.2d 889 (Fla. 1974).

Despite admonitions in two decided cases,[1] I find the evidence sufficiently establishes the requisite "quantum" of procedural unconscionability. There is testimony in the record that a substantial portion of these plaintiffs are retired or elderly on a fixed modest income and that it costs approximately $1,000 to $1,500 to move a mobile home. Of the plaintiffs who testified, almost all said they desired to move out of the park but could not afford to do so.

The aspect of substantive unconscionability, however, is more difficult. Reported Florida cases have said that substantive unconscionability can be shown by establishing (1) "gross price disparity", i.e., that the rent grossly exceeds that paid for lots of equal value in comparable parks, *De Anza Corp.* fn. 3 supra; *Bennett v. Behring Corp.*, 466 F.Supp. 689 (S.D. Fla. 1979), appeal dismissed 629 F.2d 393 (5th Cir. 1980); *Garrett v. Janiewski*, Case No. 84-1186, Fla. 4th DCA, opinion filed September 25, 1985; (2) that the increased rental is significantly higher than the fair market rental value of the lot, *De Anza Corp.*, supra; and (3) that the increase is not founded upon a legitimate financial basis, but is arbitrary, capricious and confiscatory, *Fredericks v. Hoffman*, 45 Fla.Supp. 44 (Circuit Court, Sarasota County, Fla. 1976). Any one of these factors, standing alone, may not be sufficient. They may not be exclusive; time and experience may suggest others. One court has held that an increase according to the cost of living index provision (escalator clause) in a written lease is not unconscionable. *Bennett*, supra. Finally, the courts are emphatic that the percentage of return on the park owner's capital investment is immaterial. *De Anza*, supra; *Bennett*, supra. As the court in *Bennett* stated: "[t]he question is not 'is the lessor-seller making too much money?'; but rather, "is the lessee-buyer paying an amount grossly in excess of what others similarly situated are paying for the same thing?' " 466 F.Supp. at 698.

Turning now to the evidence offered to prove substantive unconscionability, the facts are that this mobile home park was built in the early 1970s. The Thomases began to operate the park under a purchase contract in 1978 and closed the transaction in February, 1979. Subsequently, the Thomases formed a closely held Florida corporation, Friendly Estates Mobile Home Park, Inc., to which they leased the

---

[1] Language in *De Anza* and dicta in *Janiewski* reflect the view of those courts that it is most difficult, if not impossible, to prove procedural unconscionability in a class action.

park under a verbal agreement whereby the corporation would operate the park and make the monthly payments to the Thomases from which the latter would pay the mortgage and taxes. This corporation was made a party defendant. I find from the evidence that it was merely an alter ego of the Thomases.

The park can best be described as a minimum park. It has 106 lots; a modest recreational hall (part of which is used as a chapel and park office); a sewer plant, well and water treatment plant on the property; paved streets with street lights; two outdoor uncovered shuffle board courts. It has no pool; no fence bordering the public road it abuts; no security service or other amenities offered by some area parks.

In 1979 the lot rent was $50.00 per month per lot; on March 1, 1980, it increased to $55.00; on December 1, 1980 to $62.00; on April 1, 1981 to $75.00; on April 1, 1982 to $90.00; on April 1, 1983 to $102.50. It is the proposed increase on April 1, 1984 to $130.00 which is challenged in this action. This represents an increase of $27.50 per month or $330 annually, which is an increase of 27 percent over the previous year. Written leases expired April 1, 1984. Since then, plaintiffs have held verbal month-to-month tenancies. Rental includes water, sewer and garbage.

No new additional capital improvements have been added to the park since the Thomases purchased it in 1979.

The evidence establishes, in summary, that during the period of the proposed rental increase, routine maintenance of the park, roads, recreation hall and sewer and water plants has been poor over-all and practically non-existent at times. This is attributable to inadequate management by the Thomases who failed to set aside monies from gross rentals and to regularly schedule for renovation, repair and routine maintenance. Moreover, Arthur Thomas relied upon self-help and labor of family members living in the park to provide these services. The streets are in need of resurfacing. Potholes exist which have in the past simply been filled with Redi-mix asphalt. Within days they were potholes again. Inadequate drainage produces standing water in several areas of the streets after rainy periods. Improper operation and repair of the sewer plant in the past has caused periods of excessive bad odor to emanate throughout the park. From time-to-time the water has been over- or under-chlorinated rendering it unpotable. The evidence further showed that the tenant-manager had another full-time job outside the park during the week and was not always available to the tenants at night or on weekends. Mowing of grassy areas was sporadic. Enforcement of park rules and regulations was lax. In short,

not only was this a bare minimum amenity park, it was poorly managed and operated and the common areas have slowly and steadily deteriorated under the Thomases' ownership and management. All of these matters detract greatly from the rental value of the lots.

On conflicting evidence, I find that the fair market rental value of the lots within the park was $80 to $100 as of April 1984 and not $130. I further find that $130 per lot would, when allowance is made for the factors of minimum amenities, poor management, deteriorating common areas, odoriferous sewer plant and unpotable water, be significantly in excess of what was being paid for comparable mobile park lot rentals in this area.

I find that there was not a legitimate financial basis for the proposed rental increase with one possible exception. The evidence showed that the park's fixed costs and expenses, e.g., taxes, mortgage payments, utilities, labor, etc., remained relatively stable during the years of and prior to the proposed increase. Although I give this evidence little weight, the proposed increase was significantly more than the rise in the cost of living index for the same period. While Arthur Thomas testified that he expended some $30,000 in repairs to the sewer plant, this is something which could have been amortized over the 5 years previously. The evidence shows that the sewer plant is now operating properly and the effluent is meeting DER quality standards. However, the exception is that it is in violation of DER regulations by discharging effluent to surface waters and to correct this will require the outlay of a substantial sum of money. Defendants' basic contention here, if I understand it correctly, is that the rent increase is legitimate because they need it to (a) make a fair return on their capital investment, and (b) to support the renovation of the sewer plant so as to comply with DER discharge regulations. The problem I have is that although the defendants' engineer testified as to several alternative methods of dealing with the discharge, none are under contract or approved by DER and ready for implementation at an ascertained cost. Furthermore, in view of defendants' unkept premises in the past, their past poor management practices, and the fact that defendants' mortgage is under foreclosure proceedings in another case, I am skeptical as to whether the defendants would apply the rental increase properly as opposed to taking it out in repayment of loans leaving the park to founder further.

Consequently, it is

ORDERED and ADJUDGED as follows:

1. The proposed rental increase of April 1, 1984 from $102.50 to $130.00 is hereby declared to be unconscionable.

34

2. Henceforth, each plaintiff will register with defendants and pay the $102.50 monthly rental directly to defendants as they may designate. The Clerk shall continue to collect and hold the $27.50 from the plaintiffs so paying pending appeal and until further order of the court. The court retains jurisdiction for the purpose of ordering these monies to be paid to defendants or refunded to plaintiffs pending upon the outcome of the appeal.

3. Plaintiffs shall have and recover of and from defendants the sum of $35,000.00 as attorneys fees and $1,102.00 costs,[2] or a total sum of $36,102.00, for which let execution issue.

4. The court now reverses itself on an earlier ruling. Count II, being the claim for money damages for breach of statutory obligations, is dismissed with prejudice, the court being now of the opinion that these claims are mutually exclusive and to permit both, if plaintiffs should prevail on Count II, would be to allow double recovery based upon the same facts.

5. Plaintiffs' other prayers for injunctive relief are denied.

---

[2] This sum includes $500 expert witness fee for plaintiffs' witness attorney Eli Subin.