Larry GOLDEN, d/b/a Golden Mobil, Plaintiff–Appellee, Cross–Appellant,

v.

MOBIL OIL CORPORATION, a New York corporation, Defendant–Appellant, Cross–Appellee.

No. 88–3517.

United States Court of Appeals, Eleventh Circuit.

Sept. 5, 1989.

---

William D. Palmer, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, Fla., Michael C. Russ, Charles H. Kirbo, Stephanie E. Parker, King & Spalding, Atlanta, Ga., for defendant-appellant, cross-appellee.

W. Scott Gabrielson, Rush, Marshall, Bergstrom, Reber & Gabrielson, Orlando, Fla., for plaintiff-appellee, cross-appellant.

Before VANCE and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

VANCE, Circuit Judge:

In this diversity case, the defendant appeals the district court's denial of judgment notwithstanding the verdict for plaintiff on his breach of contract claim. On cross-appeal, the plaintiff challenges the court's directed verdict for the defendant on the plaintiff's fraud claim. We conclude that the court erred in both instances.

## I. BACKGROUND

Plaintiff Larry Golden leased and operated a Sun Oil Company ("Sunoco") service station located on South Orange Blossom Trail in Orlando, Florida. The station had three pumps at the full service island and two pumps at the self service island, all of which dispensed gasoline in liters. Two of the full service pumps and one of the self service pumps contained blenders, devices unique to Sunoco stations. The blenders allowed the pumps to dispense three types of unleaded gasoline from the same hose: regular unleaded, super unleaded, and a blend of regular and super unleaded. A customer could choose the desired type of unleaded gasoline by turning a switch on the pump. The configuration of the pumps at Golden's Sunoco station was as follows:

| Full Service | Self Service |
|---|---|
| Pump 1 Super Unleaded | Pump 2 Leaded |
| Pump 4 Regular Unleaded | Pump 3 Super Unleaded |
| Pump 5 Leaded | |

Golden's lease with Sunoco gave the company the right to terminate the agreement

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

in the event the station was sold. In the spring of 1984, defendant Mobil Oil Corporation purchased Golden's station and eighty-six other Sunoco stations in Florida. Mobil notified Golden of the purchase and gave him the option of buying the station for $200,000 or entering into a new lease as a Mobil dealer. Golden was interested in the possibility of purchasing the station, but was concerned that he would not be able to obtain financing. On July 11–12, 1984, therefore, he attended two meetings held by Mobil to promote the advantages of becoming a Mobil dealer. The first was held on July 11 in Orlando and the second on July 12 in Tampa. Golden testified that at the Orlando meeting a Mobil representative told him that it was the policy of the company to give customers a four cent per gallon discount for cash purchases. When Golden inquired as to the company's cash discount policy for gasoline purchased in liters, the representative responded that "it's not a problem because Mobil doesn't have gas pumps that work in liters so you won't have a problem with that."

Golden also testified that between the Tampa meeting and the date he signed the lease, Mobil representatives Dennis O'Brien and J.J. Moore promised that he would receive new gallon pumps:

[O'Brien, Moore, and I] were talking about the transition period and they were kind of telling me what would occur and I asked well, you know, when are we going to get the [new Mobil sign], when are we going to get the pumps. That was important to me. And I was told that they were starting near the end of the county or end that I was up on to put on signs and nearer the ends of the county there I gathered north or northwest and working kind of toward one another and, you know, I would get the sign and then I would get the pumps, the regular type Mobil pumps.

The Tampa meeting, which Golden's wife also attended, was entitled "Welcome Aboard." All Sunoco dealers, their spouses, and key employees were invited. The agenda included a period for viewing exhibits, a presentation, cocktails, and dinner.

Golden later testified that the Tampa meeting was a

[p]olitical rally kind of thing. At the very first going in it's hey, how [sic] you doing? Everything is going to be great for you. [Dennis O'Brien, a Mobil representative,] was taking me and I believe part of the time my wife and introducing me to just various people were [sic] there. I guess other people at his level and other people from Mobil and say [sic] hey, have you signed yet? I said, no. Well, you should sign. And things along that line.

Golden also testified that a Mobil representative told the Sunoco dealers that if they agreed to become Mobil dealers their relationship with the company "would be just like a marriage that was just going to get stronger."

On their way home from the Tampa meeting, Golden and his wife discussed their options and decided, based on Mobil's presentations, that becoming a Mobil dealer would be a good career opportunity. The company thereafter provided Golden with a proposed lease agreement and Golden sent it to his attorney for review. The attorney informed Mobil that many of the provisions of the lease were unsatisfactory, including the following limitation of liability clause:

In no event shall Landlord be liable for prospective profits or special, indirect, or consequential damages.

The company replied that the proposed agreement was its standard service station lease contract and the terms were not negotiable. Golden decided to enter into the lease anyway and signed it on July 25, 1984. The lease became effective on August 1, 1984, with a term of three years.

Golden's relationship with Mobil started to sour soon after he began operating as a Mobil dealer. Many of his requests to the company for the repair of the pumps, lighting, and pavement at his station went unheeded. The company replaced one of his liter pumps with a new gallon pump, but refused to replace others. This left Golden in the position of having to sell some gasoline in liters and some in gallons. The company also removed the blender from

Pump 3 without Golden's permission and replaced it with a regular nozzle. As a result, Golden could sell only two types of gasoline at the self service island. The configuration of the pumps after the removal of the blender was as follows:

| Full Service | Self Service |
|---|---|
| Pump 1 Regular Unleaded<br>Super Unleaded<br>Blend | Pump 2 Leaded |
| Pump 4 Regular Unleaded<br>Super Unleaded<br>Blend | Pump 3 Unleaded<br>Super Unleaded<br>Blend |
| Pump 5 Leaded | |

Mobil did not renew the lease at the end of its three-year term and Golden brought suit against the company in Florida state court. Mobil removed the case to federal court and Golden filed an amended complaint that alleged breach of contract and fraud. At the ensuing jury trial, Golden presented evidence of two types of damages, lost profits and lost rental rebates. Both were related to his inability to sell three types of gasoline at the self service island. The lost rental rebates were those that Golden would have received under a rental incentive program Mobil had offered to encourage dealers to sell more gasoline.

At the close of trial, the court granted Mobil's motion for directed verdict on the fraud claim, but denied its motion for directed verdict on the breach of contract claim. The jury subsequently returned an $83,000 verdict for Golden on the breach of contract claim and the court denied Mobil's motion for judgment notwithstanding the verdict. This appeal followed.

## II. DISCUSSION

### A. *The Contract Claim*

■ Mobil contends that the district court erred in denying judgment notwithstanding the verdict because the evidence was insufficient to support the jury's verdict on the contract claim. In reviewing a district court's ruling on a motion for directed verdict or judgment notwithstanding the verdict, we must consider all of the evidence in the light most favorable to the nonmoving party, with all reasonable inferences taken in favor of that party. If the facts and evidence point so strongly and

overwhelmingly in favor of the moving party that no reasonable person could have reached a verdict for the nonmoving party, the motion should have been granted. On the other hand, if a reasonable and fair-minded person could have returned a verdict for the nonmoving party, the motion should have been denied. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (in banc).

Mobil argues that only evidence of consequential damages was admitted at trial and that the limitation of liability clause bars Golden from recovering consequential damages. Golden does not dispute that the lost profits and lost rental rebates he sought were consequential damages as contemplated under the limitation of liability clause, but argues that the clause itself is unenforceable on the ground of unconscionability. We disagree.

Under Florida law, a contractual provision is not unenforceable on the ground of unconscionability unless "no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice...." *Steinhardt v. Rudolf*, 422 So.2d 884, 890 (Fla.Dist.Ct.App. 1982), *review denied*, 434 So.2d 889 (Fla. 1983). Both procedural unconscionability and substantive unconscionability must exist before the provision is unenforceable. *Fotomat Corp. of Fla. v. Chanda*, 464 So.2d 626, 629–30 (Fla.Dist.Ct.App.1985); *Kohl v. Bay Colony Club Condominium, Inc.*, 398 So.2d 865 (Fla.Dist.Ct.App.), *review denied*, 408 So.2d 1094 (Fla.1981); *see Steinhardt*, 422 So.2d at 889–90 (rejecting procedural-substantive analysis as a rule of law but noting that it is "generally helpful"). Procedural unconscionability exists when the individualized circumstances surrounding the transaction reveal that there was no " 'real and voluntary meeting of the minds' " of the contracting parties. *Kohl*, 398 So.2d at 868 (quoting *Johnson v. Mobil Oil Corp.*, 415 F.Supp. 264, 268 (E.D.Mich. 1976)). Substantive unconscionability exists when the terms of the contractual provision are unreasonable and unfair. *Id.*

We need not decide whether the transaction between Golden and Mobil was proce-

durally unconscionable because we hold that the limitation of liability clause was not substantively unconscionable. The Florida courts consistently have upheld the right to limit the remedies available in the event of a breach of a commercial lease agreement. *E.g., Linens of Paris, Inc. v. Cymet,* 510 So.2d 1021, 1022 (Fla.Dist.Ct. App.1987); *Rodeway Inns of Am. v. Alpaugh,* 390 So.2d 370 (Fla.Dist.Ct.App. 1980) (commercial lease that provided lessee with two alternative remedies in event of breach by lessor not contrary to Florida law or public policy). The requirements of mutuality of obligation and mutuality of remedy, of course, render exculpatory language unenforceable if it would prevent all recovery of damages for the breach of a contractual undertaking in a lease. *See Sniffen v. Century Nat'l Bank,* 375 So.2d 892, 893–94 (Fla.Dist.Ct.App.1979) (citing *Ivey Plants, Inc. v. FMC Corp.,* 282 So.2d 205, 208 (Fla.Dist.Ct.App.1973), *cert. denied,* 289 So.2d 731 (Fla.1974)). The clause at issue, however, did not prevent Golden from recovering damages for a breach of the lease by Mobil. Golden could have recovered, but did not seek, the standard measure of damages for breach of lease: "the difference between the stipulated rent and the value of the use of the premises." *Moses v. Autuono,* 56 Fla. 499, 47 So. 925, 927 (Fla.1908). Consequently, the district court erred in denying Mobil's motion for judgment notwithstanding the verdict.

## B. *The Cross Appeal for Fraud*

On cross-appeal, Golden contends that the district court erred in directing a verdict for Mobil on the fraud claim. The elements of fraud under Florida law are:

(1) a false statement concerning a material fact;

(2) the representor's knowledge that the representation is false;

(3) an intention that the representation induce another to act on it; and[ ]

(4) consequent injury by the party acting in reliance on the representation.

*Johnson v. Davis,* 480 So.2d 625, 627 (Fla. 1985) (citation omitted). We conclude that the evidence was sufficient to establish these elements based on (1) Mobil's promise to Golden that he had a "tremendous future" with the company and (2) Mobil's promises to replace all of his liter pumps with gallon pumps.

We begin by addressing the first two elements of fraud as they relate to each of these promises. Golden testified that Mobil promised him that if he signed a lease he would have a "tremendous future with Mobil" and his relationship with the company "would be just like a marriage that was just going to get stronger." This testimony was corroborated by Mobil's script of the Tampa program:

[W]e decided from the very beginning to offer every Sun dealer a three year lease. As you know, under PMPA, we could have gone the one year trial franchise route; i.e., taking a year to get acquainted. Obviously, we felt there were advantages in demonstrating our good faith and genuine confidence in you by offering leases on terms consistent with long-term existing Mobil dealers. In other words, we think the marriage is a good one. It's only going to get stronger, and it is going to be mutually beneficial.

"PMPA" refers to the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841. Under the Act, a motor fuel franchise agreement is considered a trial franchise agreement if, among other things, its initial term is for one year or less. *Id.* § 2803(b)(1)(C). If a franchisor decides not to renew a trial franchise agreement at the end of its initial term, the franchisor need only comply with statutory notification procedures. *Id.* § 2803(c)(1). On the other hand, if the term of the lease agreement is three years or longer, a franchisor cannot terminate or fail to renew a franchise unless the termination or nonrenewal is based upon grounds listed in the Act and the franchisor complies with statutory notification procedures. *Id.* § 2802(b). One of these grounds is a determination by the franchisor, made in good faith and in the normal course of business, to sell the premises. *Id.* § 2802(b)(3)(D)(i)(III).

Mobil's offer of a three year lease instead of a trial franchise, its promise that Golden would have a "tremendous future" with the company, and its referral to the proposed relationship as a "marriage" could support a finding that Mobil induced Golden to enter into the lease by representing that the company intended to establish a long-term relationship with Golden. There also was evidence that the company misrepresented this intention—that when it induced Golden to enter into the lease, the company knew that there was a strong probability that it would terminate the lease and sell the station at the expiration of the initial term of the lease. An internal Mobil memorandum dated August 31, 1983, stated that the company intended to sell any service station that sold less than 400,-000 gallons of gasoline annually unless the station had the clear potential of selling 600,000 gallons annually. A lease work sheet prepared by Mobil for Golden's station on June 14, 1984, however, listed the maximum annual volume potential for Golden's station as 300,000 gallons. Another Mobil memorandum stated the following:

> Please place the subject location on the R.E.A.D.S. list and establish recommended selling price based on M.A.I. approval (approximately $120,000).
> This location was acquired with the Sunoco takeover in August 1984. *The location was identified to be divested prior to August 1984;* however, the existing dealer, Larry Golden, rejected the $180,-000 [sic] offering price presented by Ed Goett during July 1984.

(emphasis added).

Evidence that Mobil spent as little as possible on repairs to the station also could support a finding that Mobil knew at the time it induced Golden to sign the lease that there was a substantial probability that it would sell Golden's station at the end of the initial lease term. Mobil's South Atlantic district manager, J.J. Costello, wrote the following memorandum in response to Golden's request that the company install a new pump at his station:

JAB
Determine what we are absolutely required to do. This is READS and I want to get out ASAP. No work unless required.

JJC

James A. Blesson, the Mobil employee to whom the Costello memorandum was directed, testified that Costello's reference to "READS" meant that the station had been designated for divestment.

There was evidence that, despite Golden's repeated requests, Mobil refused to make needed repairs to the lighting, pavement, and pumps at his station. The company refused to repair pumps that would not reset after pumping, pumps that would dispense gasoline without registering the amount, pumps that would work only after being beaten with a hammer, and pumps that spewed gasoline without being turned on. The company ignored Golden's repeated requests for the repair of deficient lighting and pavement at his station. Mobil's own employee testified that when he reported Golden's maintenance problems to company management, the company's only response was to send Golden a letter informing him that his lease would be terminated if he did not stay open after dark. Mobil also refused to replace all of Golden's Sunoco liter pumps with new Mobil gallon pumps, despite evidence that many customers reacted negatively to pumps that dispensed gasoline in liters.

The second element of fraud requires that the promisor had the positive intent not to perform the promise or made the promise with the present intent not to perform it. *Bissett v. Ply–Gem Indus., Inc.,* 533 F.2d 142, 145 (5th Cir.1976) (interpreting Florida law). The present case not only concerns the misrepresentation of a person's "future potential" with a company, but also concerns the company's misrepresentation of its present intent concerning that future potential. The misrepresentation therefore is actionable as fraud under Florida law. In *Telesphere Int'l, Inc. v. Scollin,* 489 So.2d 1152 (Fla.Dist.Ct.App. 1986), the court held that although a company had the absolute right to terminate an employee under the terms of an employ-

ment agreement, the company nonetheless could be liable for fraudulently inducing the employee to enter into the employment agreement if the employee could prove that the company deliberately concealed the known possibility that a discharge would in fact occur. *Id.* at 1155. The plaintiff in that case had quit his job to become the defendant's "Director of International Operations" of a hotel call accounting system that the defendant was trying to develop. There was evidence that the defendant had induced the plaintiff to join the company by deliberately failing to inform him, before the employment agreement was signed, that the company was aware of the real potentiality that the hotel accounting system would fail and the plaintiff would be discharged. *Id.* at 1153. In holding that a directed verdict for the defendant was improper, the court compared the facts before it to those in *Elizaga v. Kaiser Found. Hospitals, Inc.*, 259 Or. 542, 487 P.2d 870 (1971) (hospital could be liable for fraud for offering surgical preceptorship position to plaintiff even though defendant knew that position would be terminated shortly), and *Wildes v. Pens Unlimited Co.*, 389 A.2d 837 (Me.1978) (company could be liable for fraud for persuading plaintiff to resign existing job to become full time salesman without informing plaintiff of defendant's knowledge that corporate reorganization was likely and plaintiff's loss of sales territory could result). The *Scollin* court held that both *Elizaga* and *Wildes* were in accordance with the law of Florida. *Scollin*, 489 So.2d at 1154.

Mobil's second misrepresentation, its promises to replace all of Golden's liter pumps with gallon pumps, also satisfies the first two elements of a cause of action for fraud. Golden's testimony created a jury issue as to whether the promises to replace his pumps were made. Their materiality is clear. The promised new pumps would have enabled Golden to dispense regular unleaded gasoline at the self service island and would have eliminated the features of his old pumps to which his customers had objected. The evidence was undisputed that Mobil did not replace all of Golden's old pumps with the new gallon pumps as

promised. There also was evidence from which a jury could find that at the time Mobil made the promises it did not intend to fulfil them. D.L. Fuller, Mobil's project leader for the conversion of Sunoco stations to Mobil stations, acknowledged that at the Tampa meeting he told potential Mobil dealers that:

> [a]s for the pumps, if your station is in a high volume category, we will evaluate it as soon as possible in terms of changing over to the Mobil round pumps. In lower volume operations the pump face will be covered in white plastic and Mobil decals will be installed.

Fuller testified that Mobil had classified Golden's station as a low volume station and that the company had two alternative plans for the old Sunoco pumps: "One was [to] replace[ ] some of the dispensers with Mobil dispensers and the other was the retention of the squared off Sunoco pumps." Fuller described in detail Mobil's planned method for modifying the old Sunoco pumps. A reasonable jury therefore could have found that Mobil never intended to replace all of Golden's liter pumps with gallon pumps. Mobil's decision from the outset to divest Golden's station and its refusal to make needed repairs to the station also could support such a finding.

The sufficiency of the evidence concerning the final two elements of fraud warrants little discussion. From the context in which the claimed misrepresentations were made the intent that Golden should rely on them is implicit. The evidence also was sufficient to satisfy the last element of fraud, injury resulting from reliance on the misrepresentations. A defrauded plaintiff may recover compensatory damages under either the "out-of-pocket" rule or the "benefit of the bargain" rule. *DuPuis v. 79th Street Hotel, Inc.*, 231 So.2d 532, 536–37 (Fla.Dist.Ct.App.), *cert. denied*, 238 So.2d 105 (Fla.1970). The record supports a finding that Golden lost both profits and rental rebates because he did not receive the benefit of the bargain Mobil had promised. A reasonable jury could find that if Mobil actually had fulfilled its promise of a long-term relationship with Golden or its prom-

ises to replace all of his liter pumps with gallon pumps, the profits and rental rebates would not have been lost. Accordingly, the district court erred in directing a verdict for Mobil.

## III. CONCLUSION

The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.