[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 04, 2010
JOHN P. LEY, JR.
ACTING CLERK

_____

No. 09-10612

_____

D. C. Docket No. 08-20551-CV-PAS

JAMES PENDERGAST,
individually and on behalf of
all others similarly situated,

Plaintiff-Appellant,

versus

SPRINT NEXTEL CORPORATION,

Defendant,

SPRINT SOLUTIONS, INC.,
SPRINT SPECTRUM L.P.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 4, 2010)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,[*] Judge.

HULL, Circuit Judge:

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE FLORIDA SUPREME COURT, PURSUANT TO FLA. CONST. ART. V, § 3(b)(6).  TO THE FLORIDA SUPREME COURT AND ITS HONORABLE JUSTICES:

Plaintiff James Pendergast appeals the district court's order granting the motion to compel arbitration filed by Defendants-Appellees Sprint Solutions, Inc. and Sprint Spectrum, L.P. (collectively, "Sprint").  Plaintiff is a former Sprint wireless customer and sued Sprint, on behalf of himself and a similarly-situated class, for allegedly charging improper roaming fees for calls placed within Sprint's coverage areas.  The district court found the arbitration clause and class action waiver contained in the Terms and Conditions of Plaintiff's contract with Sprint were valid and enforceable and barred this class action.

On appeal, Plaintiff does not contest the arbitration clause itself but claims the class action waiver in Sprint's Terms and Conditions is both procedurally and substantively unconscionable under Florida law.  And because Plaintiff's contract provides the arbitration and class action waiver clauses are not severable, Plaintiff

_____

[*]Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

2

claims the arbitration clause fails because the class action waiver is unenforceable.

After review and oral argument, we determine conflicting decisions in the Florida intermediate appellate courts require that we certify certain questions to the Florida Supreme Court. Before addressing those legal issues, we provide a full factual background of this dispute.

## I. FACTUAL BACKGROUND

**A.  August 2001 Service Contract And Samsung SCH-8500 Phone**

On August 2, 2001, Plaintiff purchased a Samsung SCH-8500 wireless telephone from Sprint and agreed to a two-year service contract for Sprint wireless telephone service.[1]  On August 4, 2001, Sprint shipped Plaintiff's initial Samsung telephone to his address in Miami, Florida.  Plaintiff began using Sprint wireless services on August 6, 2001.  Plaintiff's initial bill, dated September 3, 2001, reflects that he held one account with Sprint, numbered 0071106751-0, and used wireless services through one phone number, 786-859-6129.

Plaintiff's initial two-year contract included Sprint's then-applicable Terms and Conditions.  The packaging material on the outside of the box, containing Plaintiff's Samsung SCH-8500 phone, stated the box contained a copy of Sprint's Terms and Conditions.  And the currently applicable version of Sprint's Terms and

---

[1]At oral argument, both parties conceded the facts of this action are not in dispute.

Conditions was always available on Sprint's website.  Furthermore, Plaintiff's initial invoice, dated September 3, 2001, stated:  "You may obtain a copy of the Terms and Conditions of Service for your Sprint PCS Services by writing our Customer Care Center or visiting our Internet site."

The May 22, 2001 Terms and Conditions, which were in effect when Plaintiff first began his service with Sprint, provided (1) Sprint could change the terms of its agreement with Plaintiff, (2) Plaintiff would accept any such changes by using the phone on or after the effective date of the changes, and (3) Plaintiff could terminate his service if he did not accept the changes:

> **Agreement.**  Your agreement ("Agreement") with [Sprint] and any of its affiliates doing business as Sprint PCS providing Sprint Personal Communications Services ("Services") to you is made up of these Terms and Conditions of Service ("Terms") and the Service Plan that we agree to provide to you . . . .
> . . . .
> **Changes to Agreement.**  We may change this Agreement at any time (but see Service Plan).  Any changes to the Terms are effective when we publish the revised Terms.  If you use our Services or make any payment to us on or after the effective date of the changes, you accept the changes.  If you do not accept the changes, you may terminate Services (but see Termination and Changing Service Plans).  For purposes of the Agreement, "use" includes keeping the right to access the Sprint PCS Network by not terminating Services.  You may not modify the Agreement except for your Service Plan (see Termination and Changing Service Plans).

4

Another section of the May 2001 Terms and Conditions provided Plaintiff with a

14-day period after activating his initial phone, during which he could terminate

his service with Sprint without penalty:

> **Termination:  Term Service Plans.**  If you are on a Term Service Plan (1) your ability to terminate Services before the end of the term is limited, (2) your ability to change to another Service Plan before the end of the term may be limited, and may result in a termination or activation fee, (3) you may be required to pay a termination fee.  No termination fee is charged if you terminate a Term Service Plan within 14 days of activation of your Sprint PCS Phone.

Sprint's May 2001 Terms and Conditions had a clause limiting Plaintiff's potential

remedies against Sprint, specifically barring incidental, consequential, punitive, or

special damages:

> **NO CONSEQUENTIAL OR OTHER DAMAGES.** UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH PROVIDING OR FAILING TO PROVIDE SERVICES, PHONES OR OTHER EQUIPMENT USED IN CONNECTION WITH THE SERVICES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES.  THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT.

(emphasis and capitalization in original).[2]  The May 2001 Terms and Conditions

contained a clause requiring arbitration of most disputes:

> **ARBITRATION OF DISPUTES.** ANY CLAIM,
> CONTROVERSY OR DISPUTE, WHETHER
> SOUNDING IN CONTRACT, STATUTE, OR TORT,
> INCLUDING FRAUD, MISREPRESENTATION, OR
> ANY OTHER LEGAL THEORY, RELATED
> DIRECTLY OR INDIRECTLY TO THE SERVICES . . .
> SHALL BE RESOLVED BY ARBITRATION AS
> PRESCRIBED IN THIS SECTION.  THE FEDERAL
> ARBITRATION ACT, NOT STATE LAW, GOVERNS
> THE QUESTION OF WHETHER A CLAIM IS
> SUBJECT TO ARBITRATION.

The May 22, 2001 Terms and Conditions did not include a class action waiver as

part of the arbitration clause.[3]

---

[2]Throughout this opinion, we quote contractual provisions with emphases and capitalization as they appear in the record.

[3]The parties have litigated this case as though the May 22, 2001 Terms and Conditions were what Plaintiff received in the box for his Samsung SCH-8500 phone and through Sprint's website.  See Marsh v. Butler County, Ala., 268 F.3d 1014, 1023 n.4 (11th Cir. 2001) (en banc) (construing complaint in the manner litigated by the parties and district court).  However, we note Sprint advised the district court that the box containing Plaintiff's initial Samsung SCH-8500 phone may have contained a printed copy of the Terms and Conditions effective May 1, 2000.  The Terms and Conditions effective May 1, 2000 did not contain an arbitration clause.  The May 1, 2000 Terms and Conditions did, however, contain a class action waiver.  The May 1, 2000 Terms and Conditions provided: "**WAIVER OF CLASS ACTIONS.**  YOU AGREE THAT ALL CLAIMS BETWEEN YOU AND SPRINT PCS RELATED TO THIS AGREEMENT WILL BE LITIGATED INDIVIDUALLY AND THAT YOU WILL NOT CONSOLIDATE OR SEEK CLASS TREATMENT FOR ANY CLAIM . . . . THIS WAIVER APPLIES TO THIS AGREEMENT AS AMENDED OR MODIFIED.  THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT."  In its Terms and Conditions effective May 22, 2001, Sprint added the arbitration clause quoted above and removed the class action waiver.

Plaintiff's affidavit states that: "Once I had contracted with Sprint in 2001, I could not have left Sprint for another Carrier without rendering my cell phone(s) useless, as they only worked on Sprint's network." However, Sprint presented evidence that Plaintiff was permitted to sell his mobile phone(s) to others, through websites such as www.ebay.com, without interference from Sprint. And third parties who acquire used Sprint mobile phones can activate those phones and use them on the Sprint network.

**B.      February 2003 – Samsung SPH-A460 Phone**

On February 24, 2003, Plaintiff acquired and activated a new Samsung model SPH-A460 mobile phone in person at a Sprint store in Coral Gables, Florida. Plaintiff retained his original account number (0071106751-0) and original mobile phone number (786-859-6129) when he acquired and activated this new mobile phone.

The telephone box for the Samsung model SPH-A460 wireless phone contained a copy of the phone's user guide, which contained a copy of Sprint's Terms and Conditions. The record does not reflect which version of Sprint's Terms and Conditions were printed in the user guide for Plaintiff's new Samsung model SPH-A460 phone. The packaging material on the outside of the box for the Samsung model SPH-A460 phone also stated that the box contained a copy of

7

Sprint's Terms and Conditions.

## C. July 2, 2005 Service Agreement And Samsung PM-A740 Phone

On July 2, 2005, Plaintiff signed a two-year PCS Advantage Agreement with Sprint. At the time he entered into the Advantage Agreement, Plaintiff also acquired a new Samsung PM-A740 mobile phone at a Sprint Store in Coral Gables, Florida and activated a second phone line with a second phone number (786-859-9624).

Sprint subsidizes the purchase price of the majority of wireless telephones it sells to its subscribers. However, the record does not reflect how much of the purchase price of Plaintiff's new Samsung PM-A740 mobile phone was subsidized by Sprint, although Plaintiff admits he received a "discount" on the purchase price of the phone. Similarly, there is no evidence in the record indicating what, if anything, Plaintiff paid for any of the phones in this case.

The telephone box for the new Samsung PM-A740 wireless phone Plaintiff acquired on July 2, 2005 contained a copy of the user guide for that phone, which contained a copy of Sprint's Terms and Conditions effective June 30, 2004.[4] The box's exterior also stated it contained a copy of Sprint's Terms and Conditions.

---

[4]Plaintiff asserts, and Sprint does not dispute, that Plaintiff was not provided notice of the June 30, 2004 Terms and Conditions at the time they went into effect in 2004. However, Plaintiff did receive a copy of the June 30, 2004 Terms and Conditions on July 2, 2005 when he expanded his Sprint account to include a second phone line.

8

Sprint's Terms and Conditions effective June 30, 2004 provide that the customer accepts the Terms and Conditions by using or paying for Sprint's Services:

> This agreement ("Agreement") covers the terms on which we agree to provide and you agree to accept any service or product we make available to you, including your wireless services, wireless devices, etc. (collectively "Services"). You accept this Agreement when you do any of the following: (a) *provide your written or electronic signature;* (b) *accept through an oral or electronic statement;* (c) *attempt to or in any way use any of the Services;* (d) *pay for any Services; or* (e) *open any materials or package that says you are accepting when you open it.*

The Terms and Conditions effective June 30, 2004 also provide a mechanism, similar to the May 2001 Terms and Conditions, for Sprint to amend the Agreement and for Plaintiff to accept or refuse Sprint's changes. The 2004 Terms and Conditions provide: "We may change the Agreement at any time with notice. Any changes to the Agreement are effective when we publish them. If you use our Services or make any payment to us on or after the effective date of the changes, you accept the changes." The 2004 Terms and Conditions also provide that Plaintiff could terminate the agreement, without incurring an early termination fee, within 30 days after changes to the Agreement go into effect if those changes were made to a material term and had a material adverse effect on Plaintiff.

Similar to the 2001 Terms and Conditions, the 2004 Terms and Conditions also contained a limitation on Sprint's liability for incidental, consequential, punitive, or special damages:

> **NO CONSEQUENTIAL OR OTHER DAMAGES.** UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH PROVIDING OR FAILING TO PROVIDE SERVICES, PHONES OR OTHER EQUIPMENT USED IN CONNECTION WITH THE SERVICES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES. THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT.

The June 30, 2004 Terms and Conditions contained an arbitration clause, similar to the one in Sprint's May 2001 Terms and Conditions, requiring arbitration of all disputes except for those within the jurisdiction of a small claims court. The June 2004 Terms and Conditions included a new class action waiver, printed in capital letters:

> **MANDATORY ARBITRATION OF DISPUTES:** INSTEAD OF SUING IN COURT, YOU AND SPRINT AGREE TO ARBITRATE ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES AGAINST EACH OTHER ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . . THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT AND ITS PROVISIONS, NOT STATE LAW, GOVERN ALL

10

QUESTIONS OF WHETHER A CLAIM IS SUBJECT
TO ARBITRATION.  THIS PROVISION DOES NOT
PREVENT EITHER YOU OR SPRINT FROM
BRINGING APPROPRIATE CLAIMS IN SMALL
CLAIMS COURT, BEFORE THE FEDERAL
COMMUNICATIONS COMMISSION OR A STATE
PUBLIC UTILITIES COMMISSION.

YOU AND SPRINT FURTHER AGREE THAT
NEITHER SPRINT NOR YOU WILL JOIN ANY
CLAIM WITH THE CLAIM OF ANY OTHER
PERSON OR ENTITY IN A LAWSUIT,
ARBITRATION OR OTHER PROCEEDING; THAT
NO CLAIM EITHER SPRINT OR YOU HAS
AGAINST THE OTHER SHALL BE RESOLVED ON
A CLASS-WIDE BASIS; AND THAT NEITHER
SPRINT NOR YOU WILL ASSERT A CLAIM IN A
REPRESENTATIVE CAPACITY ON BEHALF OF
ANYONE ELSE.  IF FOR ANY REASON THIS
ARBITRATION PROVISION DOES NOT APPLY TO
A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY.
. . . .
We agree to pay our respective arbitration costs, . . . but
the arbitrator can apportion these costs as appropriate.
. . . .
If any party files a judicial or administrative action
asserting a claim that is subject to arbitration and another
party successfully stays such action or compels
arbitration, the party filing that action must pay the other
party's costs and expenses incurred in seeking such stay
or compelling arbitration, including attorneys' fees.

If any portion of this Mandatory Arbitration of Disputes
section is determined to be invalid or unenforceable, the
remainder of the Section remains in full force and effect.

Plaintiff began using this second phone number on July 2, 2005.  At the time

11

Plaintiff executed the 2005 agreement, at least two of Sprint's competitors – Virgin Mobile and TracFone – offered mobile phone service in his area without class action waivers.

When he acquired his second mobile phone line on July 2, 2005, Plaintiff signed a two-year Advantage Agreement. The Advantage Agreement explicitly notified Plaintiff that an arbitration clause was in Sprint's Terms and Conditions. By signing the Advantage Agreement, Plaintiff attested he had read and agreed to all terms of Sprint's most recent Terms and Conditions (which contained the class action waiver). The Advantage Agreement as executed by Plaintiff provides:

> PCS Advantage Agreement
> 2-Year PCS Advantage Agreement
> MDN: (786) 859-9624
> Name: JAMES PENDERGAST
> Date: 7/2/2005
>
> You are entering into a binding legal Agreement with Sprint on behalf of yourself or your company (if you are a Business Customer). Your Agreement includes: (i) the requirements and terms of the PCS Services Plan(s) you choose as set forth in the Service Plan Guide and other printed materials made available to you at our store; (ii) if your PCS service plan is not specifically set forth in any printed materials, the requirements and terms set forth in the current Service Plan Guide, excluding the monthly charge and number of minutes included in your PCS Service Plan – e.g., Anytime, Night & Weekend, PCS to PCS, etc.; (iii) the most recent Terms and Conditions of Service for PCS ("Ts&Cs"); and (iv) the items below.

A copy of the Ts&Cs is provided in your phone box or available upon request, at www.sprintpcs.com or through Sprint's Customer Service Solutions department at 1-800-480-4PCS (4727).

MANDATORY ARBITRATION.  As set forth more completely in the Ts&Cs, you agree to a mandatory arbitration provision providing that (except for matters properly brought to small claims courts) any legal or equitable claim, controversy or dispute of any kind between you and Sprint and/or any of its employees, agents, affiliates or other representatives, must be resolved by final and binding arbitration.
. . . .
Return Policy.  Requires return of your complete, undamaged PCS Phone with the original retailer's proof of purchase, within 14 days of purchase and activation (30 days for California residents).  We will provide a refund either by check or a charge-card credit.  We will refund any activation fee paid and will not charge you an Early Termination Fee.  You will remain responsible for all charges based on usage prior to deactivation of the phone (e.g. service charges, taxes, surcharges, etc.).
. . . .
By signing below, you (i) represent that all information you have provided to Sprint is correct; (ii) agree that you have read and agreed to all terms of this Agreement, including the requirements of your PCS Service Plan and the most recent Ts&Cs; and (iii) if purchasing on behalf of a business, represent that you are authorized to sign on such company's behalf.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE

Customer Signature

13

On July 13, 2005, Plaintiff changed the phone number on his second phone line to 312-545-8378. Plaintiff continued to use this second phone line (with the new number) by placing calls on it throughout July 2005. So from July 1-13, 2005, Plaintiff's second phone number was 786-859-9624, and from July 13, 2005 forward it was 312-545-8378.

Plaintiff's first invoice, dated August 1, 2005, following the acquisition of his second phone line reflects Plaintiff still carried only one account with Sprint (No. 0071106751-0) on which three different phone numbers were billed during July 2005. Plaintiff's August 1, 2005 invoice also stated that Plaintiff could view the most current version of Sprint's Terms and Conditions online or by contacting Sprint.[5] In other words, Plaintiff added the second phone line (with number 786-859-9624 and then changed it to 312-545-8378) to his pre-existing account for his first phone line (786-859-6129). Plaintiff's August 1, 2005 invoice reflected that he continued to carry one account, stating: "Because you added a new phone to your account, you will see charges for more than one month of service."

**D.     July 2006 – LG VI-5225 Phone**

On July 5, 2006, Plaintiff activated a LG model VI-5225 mobile phone for

---

[5]The August 1, 2005 invoice states: "**OTHER IMPORTANT INFORMATION** The Terms and Conditions of Sprint PCS Service sometimes change. For the most current version, please visit our Web site at www.sprintpcs.com or contact us."

use on his first phone line (786-859-6129). The telephone box for the LG VI-5225 phone contained a copy of Sprint's Terms and Conditions as an independent document, as opposed to contained in the phone's user's guide.[6]

Plaintiff continued to use his one account (No. 0071106751-0) with two phone lines until July 10, 2006. As of July 10, 2006, Plaintiff's second phone line (then with the number 312-545-8378) became inactive. Thus, as of July 10, 2006, Plaintiff had what he started with in 2001: one phone line with the same phone number (786-859-6129) and the same account number (0071106751-0).

In summary, the record shows that during 2001-2006, Plaintiff moved this first phone line between three different phones: a Samsung SCH-8500 from August 2, 2001 to February 24, 2003; a Samsung SPH-A460 from February 24, 2003 to July 5, 2006; and a LG VI-5225 from July 5, 2006 to January 20, 2008. Plaintiff also had a second phone line with a Samsung PM-A740 phone from July 2005 to July 2006. Each time he acquired a new phone, Sprint provided Plaintiff with a copy of its Terms and Conditions in effect at that time, and it appears Plaintiff's monthly invoices consistently informed Plaintiff that Sprint's current Terms and Conditions always were available on Sprint's website. And he was given a copy of

---

[6]The record does not reflect which version of Sprint's Terms and Conditions were in effect as of July 5, 2006 or which version of the Terms and Conditions were contained in the box for Plaintiff's LG VI-5225 phone.

the Terms and Conditions containing the class action waiver in both 2005 and 2006 when he acquired new phones.

## E.    2007-2008

On December 2, 2006, Sprint issued an invoice to Plaintiff for his one account No. 0071106751-0 which gave the following advance notice that Sprint's Terms and Conditions for its service plans would change as of January 1, 2007:

> **Important Notice.**
> The Terms & Conditions for Sprint PCS and Nextel services have been updated.  These new terms are effective January 1, 2007, and are available at www.sprint.com or upon request.  Please carefully review these terms as they apply to any future use of our services.

The revised Terms and Conditions effective as of January 1, 2007 were available on Sprint's website in December 2006.[7]  After receiving notice of the updates to Sprint's Terms and Conditions, Plaintiff remained a Sprint customer until January 2008.

The January 2007 Terms and Conditions defined Sprint's "Service" as "our offers, rate plans, options, wireless services or Devices on your account with us."

---

[7]In addition to the notice quoted above and similar to the invoice for July 2005, Plaintiff's December 2, 2006 invoice also states: "**OTHER IMPORTANT INFORMATION** For the most current version of the Sprint PCS Terms and Conditions of Service, please visit our Web site at www.sprint.com or contact us."  There is no indication in the record that Sprint's revised Terms and Conditions, or Sprint's website, tells the subscriber where the newest changes are made in any of the Terms and Conditions at issue in this case.

16

The Terms and Conditions also provided: "These Ts&Cs apply to our standard wireless Services and any other Service we offer you that references these Ts&Cs."

Similar to its Terms and Conditions since 2001, Sprint's January 2007 Terms and Conditions provided that the customer accepts the terms by use of or payment for Sprint services after the effective date:

> **When You Accept The Agreement**
>
> You must have the legal capacity to accept the Agreement. You accept the Agreement when you do any of the following: (a) sign a contract with us on paper or electronically; (b) accept Agreement through an oral or electronic statement; (c) attempt to or in any way use the Services; (d) pay for the Services; or (e) open any package or start any program that says you are accepting the Agreement when doing so. **If you don't want to accept the Agreement, don't do any of these things.**

Also similar to Sprint's previous Terms and Conditions, the Terms and Conditions effective January 1, 2007 gave Sprint the unilateral right to amend the agreement and permitted Plaintiff to terminate the contract within 30 days of such an amendment:

> **Our Right To Change The Agreement & Your Related Rights**
>
> **We may change any part of the Agreement at any time, including, but not limited to, rates, charges, how we calculate charges, or your terms of Service. We will provide you notice of material changes, and may provide you notice of non-material changes, in a**

17

**manner consistent with this Agreement (see "Providing Notice Under This Agreement" paragraph). Except as provided below, if a change we make to the Agreement is material and has a material adverse effect on you, you may terminate each line of Service materially affected without incurring an Early Termination Fee only if you: (a) call us within 30 days after the effective date of the change; and (b) specifically advise us that you wish to cancel Services because of a material change to the Agreement that we have made.** If you do not cancel Service within 30 days of the change, an Early Termination Fee will apply if you terminate Services before the end of any applicable Term Commitment.

The 2007 Terms and Conditions again contained a provision limiting

Sprint's liabilities for incidental, consequential, punitive, or special damages:

**You Agree Our Liability Is Limited – No Consequential Damages.**

TO THE EXTENT ALLOWED BY LAW, OUR LIABILITY FOR MONETARY DAMAGES FOR ANY CLAIMS YOU MAY HAVE AGAINST US IS LIMITED TO NO MORE THAN THE PROPORTIONATE AMOUNT OF THE SERVICE CHARGES ATTRIBUTABLE TO THE AFFECTED PERIOD. UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATED TO PROVIDING OR FAILING TO PROVIDE SERVICES IN CONNECTION WITH A DEVICE, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES.

In the January 2007 Terms and Conditions, Sprint expanded its arbitration provisions, now under the heading of "**DISPUTE RESOLUTION**." As the prior arbitration provisions had, the January 2007 arbitration provision allowed Plaintiff to pursue qualifying claims in small claims court. All other disputes had to be brought before an arbitrator. However, the January 2007 Terms and Conditions expressly provided that, "just as a court would, the arbitrator must honor the terms and limitations in the Agreement and can award the same damages and relief, including any attorney's fees, authorized by law." Similar to the Terms and Conditions since June 2004, the January 2007 Terms and Conditions continued to include a class action waiver, but now the class action waiver appeared twice – once as part of the arbitration clause, and a second time as a stand-alone waiver of all potential class action claims. The arbitration clause and first notice of class action waiver, all under the heading "Dispute Resolution," are offset from the rest of the Terms and Conditions in a box and provide the arbitration clause and class action waiver are not severable from each other:

## DISPUTE RESOLUTION

### We Agree To First Contact Each Other With Any Disputes

We each agree to first contact each other with any disputes and provide a written description of the problem

19

. . . .

**Instead Of Suing In Court, We Each Agree To Arbitrate Disputes**

We each agree to finally settle all disputes (as defined and subject to any specific exceptions below) only by arbitration . . . .

(6) **We each agree not to pursue arbitration on a classwide basis. We each agree that any arbitration will be solely between you and us (not brought on behalf of or together with another individual's claim). If for any reason any court or arbitrator holds that this restriction is unconscionable or unenforceable, then our agreement to arbitrate doesn't apply and the dispute must be brought in court.**

. . . .

**Exceptions To Our Agreement To Arbitrate Disputes**
Either of us may bring qualifying claim in small claims court. In addition, this arbitration provision does not prevent you from filing your dispute with any federal, state or local government agency that can, if the law allows, seek relief against us on your behalf.

Immediately after the above, a second notice of class action waiver followed

outside the text box:

**No Class Actions**
TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO PURSUE DISPUTES ON A CLASSWIDE BASIS; THAT IS, TO EITHER JOIN A CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY, OR ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF

20

ANYONE ELSE IN ANY LAWSUIT, ARBITRATION
OR OTHER PROCEEDING.

**No Trial By Jury**
TO THE EXTENT ALLOWED BY LAW, WE EACH
WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY
LAWSUIT, ARBITRATION, OR OTHER
PROCEEDING.

The January 2007 Terms and Conditions also provided that as to arbitration,

Sprint "will cover any arbitration administrative or filing fees above: (a) $25 if you

are seeking less than $1,000 from us; or (b) the equivalent court filing fees for a

court action in the appropriate jurisdiction if you are seeking $1,000 or more from

us."

On December 2, 2007, Sprint issued an invoice to Plaintiff containing

advance notice that the Terms and Conditions again would be amended, effective

January 1, 2008.[8]  The notice provided:

> **Important Notice: Changes to Terms and Conditions**
> The Terms & Conditions for Sprint PCS and Nextel
> services have been updated.  These new terms are
> effective January 1, 2008, and are available at sprint.com
> or upon request.  Please carefully review these terms as
> they apply to any future use of our services.

Plaintiff continued to use his Sprint service following the January 1, 2008 effective

---

[8]The December 2, 2007 invoice again also provided:  "**OTHER IMPORTANT INFORMATION** For the most current version of the Sprint PCS Terms and Conditions of Service, please visit our Web site at www.sprint.com or contact us."

date.

Sprint's January 2008 Terms and Conditions are not materially distinguishable from its January 2007 Terms and Conditions. Similar to the previous Terms and Conditions, the January 2008 Terms and Conditions provide they are accepted upon Plaintiff's using Sprint services[9] after the effective date:

> **When You Accept The Agreement**
>
> You must have the legal capacity to accept the Agreement. You accept the Agreement when you do any of the following: (a) sign a contract with us on paper or electronically; (b) accept Agreement through an oral or electronic statement; (c) attempt to or in any way use the Services; (d) pay for the Services; or (e) open any package or start any program that says you are accepting the Agreement when doing so. *If you don't want to accept the Agreement, don't do any of these things.*

The 2008 Terms and Conditions again give Sprint the right to unilaterally modify the agreement and Plaintiff the right to terminate his contract within 30 days of a material change:

> **Our Right To Change The Agreement & Your Related Rights**
>
> *We may change any part of the Agreement at any time, including, but not limited to, rates, charges, how we*

---

[9]The January 2008 Terms and Conditions again defined "Service" as "our offers, rate plans, options, wireless services or Devices on your account with us," and stated, "These Ts&Cs apply to our standard wireless Services and any other Service we offer you that references these Ts&Cs."

*calculate charges, or your terms of Service. We will provide you notice of material changes, and may provide you notice of non-material changes, in a manner consistent with this Agreement (see "Providing Notice To Each Other Under The Agreement" section). If a change we make to the Agreement is material and has a material adverse effect on Services under your Term Commitment, you may terminate each line of Service materially affected without incurring an Early Termination Fee only if you: (a) call us within 30 days after the effective date of the change; and (b) specifically advise us that you wish to cancel Services because of a material change to the Agreement that we have made.* If you do not cancel Service within 30 days of the change, an Early Termination Fee will apply if you terminate Services before the end of any applicable Term Commitment.*

The January 2008 Terms and Conditions limit Sprint's liabilities:

**You Agree Our Liability Is Limited – No Consequential Damages.**

TO THE EXTENT ALLOWED BY LAW, OUR LIABILITY FOR MONETARY DAMAGES FOR ANY CLAIMS YOU MAY HAVE AGAINST US IS LIMITED TO NO MORE THAN THE PROPORTIONATE AMOUNT OF THE SERVICE CHARGES ATTRIBUTABLE TO THE AFFECTED PERIOD. UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATED TO PROVIDING OR FAILING TO PROVIDE SERVICES IN CONNECTION WITH A DEVICE, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT

PRODUCTS AND SERVICES.

Finally, the January 2008 Terms and Conditions contain slightly updated arbitration and class action waiver provisions and similarly provide that Sprint will pay certain arbitration fees, that the arbitrator can award damages and relief, including attorney's fees, as authorized by law, and that the arbitration and class action waiver are non-severable:

**DISPUTE RESOLUTION**

*We Agree To First Contact Each Other With Any Disputes*
We each agree to first contact each other with any disputes and provide a written description of the problem
. . . .

*Instead Of Suing In Court, We Each Agree To Arbitrate Disputes*
We each agree to finally settle all disputes (as defined and subject to any specific exceptions below) only by arbitration. In arbitration, there's no judge or jury and review is limited. However, just as a court would, the arbitrator must honor the terms and limitations in the Agreement and can award the same damages and relief, including any attorney's fees, authorized by law.
. . . .
(6) *We each agree not to pursue arbitration on a classwide basis. We each agree that any arbitration will be solely between you and us (not brought on behalf of or together with another individual's claim). If for any reason any court or arbitrator holds that this restriction is unconscionable or unenforceable, then our agreement to arbitrate doesn't apply and the dispute must be brought in court.*

24

(7) We each are responsible for our respective costs relating to counsel, experts, and witnesses, as well as any other costs relating to the arbitration. However, we will cover any arbitration administrative or filing fees above: (a) $25 if you are seeking less than $1,000 from us; or (b) the equivalent court filing fees for a court action in the appropriate jurisdiction if you are seeking $1,000 or more from us.

**Exceptions To Our Agreement To Arbitrate Disputes**
Either of us many bring qualifying claims in small claims court. In addition, this arbitration provision does not prevent you from filing your dispute with any federal, state or local government agency that can, if the law allows, seek relief against us on your behalf.

**No Class Actions**
TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO PURSUE DISPUTES ON A CLASSWIDE BASIS; THAT IS, TO EITHER JOIN A CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY, OR ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE IN ANY LAWSUIT, ARBITRATION OR OTHER PROCEEDING.

**No Trial By Jury**
TO THE EXTENT ALLOWED BY LAW, WE EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT, ARBITRATION OR OTHER PROCEEDING.

Plaintiff remained a Sprint customer from August 6, 2001 until January 20, 2008, when he had his original phone number (786-859-6129) ported to another

service provider, without notification to Sprint.[10]

## F.    District Court Proceedings

On February 29, 2008, Plaintiff filed this action, individually and on behalf of a similarly situated class. Plaintiff alleges Sprint improperly charged customers roaming fees while they were physically in Sprint's coverage area. Plaintiff alleges Sprint's network limitations caused it to route calls placed within its geographic coverage area to cellular towers owned by other carriers, causing improper charging of roaming fees. Plaintiff asserts claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and Florida law, including breach of contract and negligent misrepresentation. He seeks monetary damages and declaratory and injunctive relief. Plaintiff estimates his actual individual damages to be approximately $20.00.

Plaintiff bases his claims entirely on alleged improper roaming charges. In his first affidavit, Plaintiff avers that: "During the summer of 2007, I learned for the first time that Sprint may have been wrongfully charging me for roaming fees for calls made or received in a PCS coverage area, so I examined my past invoices and saw several charges that I brought to my attorney's attention." The record reflects Plaintiff was charged for a total of 39 roaming minutes between July 1,

_____

[10]Since 2003, Federal Communications Commission rules have required phone number portability between mobile phone providers. 47 C.F.R. § 52.31.

26

2004 and June 30, 2006. Each roaming minute was incurred on Plaintiff's original phone number (786-859-6129).

Plaintiff's second affidavit avers that he cannot afford a lawyer at an hourly rate to assert his claims against Sprint and that, absent the benefit of a class action, he would not pursue his claims at all because the risk of non-recovery and cost of arbitration outweigh the value of any potential award.

Sprint filed a motion to compel arbitration, contending the arbitration and class-action waiver clauses in its January 1, 2008 Terms and Conditions barred this suit. In response, Plaintiff did not argue the arbitration clause itself is unconscionable. Plaintiff's argument is that the <u>class action waiver</u> is unconscionable and thus unenforceable. Sprint's January 2008 Terms and Conditions, as they have since January 2007, explicitly require that the arbitration and class action waiver provisions not be severed from each other. The district court recognized that the enforceability of the class action waiver was a threshold issue not severable from the arbitration clause itself. All parties agreed, and the district court found, that the enforceability of the class action waiver in Plaintiff's contract with Sprint is governed by Florida law.

On January 13, 2009, following a hearing and supplemental briefing, the district court agreed with Sprint, compelled arbitration, and dismissed the case.

The district court reasoned that under Florida law, Plaintiff must show both procedural and substantive unconscionability to establish that a class action waiver is unenforceable. The district court found the class action waiver was not procedurally unconscionable and thus must be enforced. The district court expressly declined to address substantive unconscionability.

Plaintiff filed this timely appeal.[11]

## II. DISCUSSION

### A. Florida Law Controls

Federal courts sitting in diversity apply the substantive law of the state in which the case arose. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938). In this diversity case, we review the enforceability of the class action waiver in Sprint's Terms and Conditions in accordance with Florida law. See Associated Mech. Contractors, Inc. v. Martin K. Eby Const. Co., 271 F.3d 1309, 1314 (11th Cir. 2001).

In instances where a state's highest court has not ruled on a point of state law, "'federal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule

---

[11]This Court reviews the district court's grant of Sprint's motion to compel arbitration de novo. Dale v. Comcast Corp., 498 F.3d 1216, 1219 (11th Cir. 2007). We also review de novo a district court's determination and application of state law in a diversity case. Gen. Am. Life Ins. Co. v. AmSouth Bank, 100 F.3d 893, 897 (11th Cir. 1996).

28

otherwise.'" Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009)

(quoting King v. Order of United Commercial Travelers of Am., 333 U.S. 153,

158, 68 S. Ct. 488, 491 (1948)). Our precedent indicates that all other data may be

considered to the extent they indicate how the Florida Supreme Court might rule

on an issue. See id., 577 F.3d at 1326 (quoting Putman v. Erie City Mfg. Co., 338

F.2d 911, 917 (5th Cir. 1964)) ("'The Court is forced, therefore, to look to all

available data; for example, to such sources as the Restatements of Law, treatises

and law review commentary, and the majority rule, keeping in mind that it must

choose the rule which it believes the state court, from all that is known about its

methods of reaching decisions[,] is likely in the future to adopt.'").[12]

"'Where there is any doubt as to the application of state law, a federal court

should certify the question to the state supreme court to avoid making unnecessary

Erie "guesses" and to offer the state court the opportunity to interpret or change

existing law.'" CSX Transp., Inc. v. City of Garden City, 325 F.3d 1236, 1239

(11th Cir. 2003) (quoting Mosher v. Speedstar Div. of AMCA Int'l, Inc., 52 F.3d

913, 916-17 (11th Cir.1995)).

## B.    Florida Standards For Unconscionability

The first issue on appeal is whether Florida law requires a plaintiff to show

---

[12]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

both procedural and substantive unconscionability to establish that a class action waiver is unenforceable.[13]

Plaintiff argues that under Florida contract law the test for unconscionability is "chameleon-like" and that at least some formulations of it do not require a showing of both procedural and substantive unconscionability. Alternatively, Plaintiff argues that even if both are required, Florida courts use a balancing test or sliding scale, such that if a high amount of procedural unconscionability exists, Plaintiff need show only a minimal amount of substantive unconscionability. Plaintiff asserts the district court erred in assessing procedural and substantive unconscionability independently and stopping its analysis entirely after finding no procedural unconscionability.

Our review of Florida law confirms the district court's interpretation of Florida law as requiring a showing of both procedural and substantive

---

[13]Although Plaintiff complains only about Sprint's class action waiver, that waiver is a non-severable portion of the arbitration clause in Sprint's Terms and Conditions. "The validity of an arbitration agreement is generally governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"), which was enacted in 1925 to reverse the longstanding judicial hostility toward arbitration." Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005). Under the FAA, arbitration agreements are enforceable except where state or federal law provides grounds for their revocation. Id. "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." Dale, 498 F.3d at 1219 (quotation omitted). The parties do not dispute that given the non-severability of the arbitration and class action waiver clauses in Sprint's agreement, the defense of unconscionability to the class action waiver is available to the Plaintiff as to Sprint's motion to compel arbitration.

unconscionability. Precedent from the Florida Third District Court of Appeal consistently requires a showing of both procedural and substantive unconscionability. Hialeah Auto., LLC v. Basulto, __ So.2d __, No. 3D07-855, 2009 WL 187584, at *2 (Fla. 3d Dist. Ct. App. Jan. 28, 2009) ("Our court has said that, to invalidate a contract for unconscionability 'under Florida law, a court must find that the contract is both procedurally and substantively unconscionable.'") (quoting Murphy v. Courtesy Ford, L.L.C., 944 So.2d 1131, 1134 (Fla. 3d Dist. Ct. App. 2006)); see also Golden v. Mobil Oil Corp., 882 F.2d 490, 493 (11th Cir. 1989) (stating in a commercial lease setting that Florida courts require a plaintiff to show both procedural and substantive unconscionability). Decisions from other Florida appellate districts also consistently require a showing of both procedural and substantive unconscionability. E.g., Bland v. Health Care & Retirement Corp. of Am., 927 So.2d 252, 256 (Fla. 2d Dist. Ct. App. 2006); Fonte v. AT&T Wireless Servs., Inc., 903 So.2d 1019, 1025 (Fla. 4th Dist. Ct. App. 2005); Powertel, Inc. v. Bexley, 743 So.2d 570, 574 (Fla. 1st Dist. Ct. App. 1999).

Nonetheless, there is some tension in Florida law regarding the analytical framework courts should use in evaluating both procedural and substantive unconscionability. Must courts evaluate both prongs simultaneously in a balancing exercise, or may courts stop the analysis after finding either procedural or

31

substantive unconscionability to be independently lacking?

Some Florida courts appear to reject the procedural-plus-substantive unconscionability requirement as a rule of law or use a balancing or sliding scale approach. Steinhardt v. Rudolph, 422 So.2d 884, 889 (Fla. 3d Dist. Ct. App. 1982) (stating that although most courts take a "balancing approach" requiring "a certain quantum of procedural plus a certain quantum of substantive unconscionability," the "procedural-substantive analysis is . . . only a general approach to the unconscionability question and is not a rule of law") (quotation omitted and emphasis added); Fonte, 903 So.2d at 1025 ("'The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree . . . .'"); Romano v. Manor Care, Inc., 861 So.2d 59, 62 (Fla. 4th Dist. Ct. App. 2003) (stating "[e]ssentially a sliding scale is invoked" and "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa").

Other Florida courts do not use, and some in fact never mention, a balancing or sliding scale approach and assess procedural and substantive unconscionability independently, concluding that if one part of the unconscionability test is not

32

established, the other part need not be examined at all.  <u>Bland</u>, 927 So.2d at 257 ("This court, however, eschews the 'sliding scale' approach.  Rather, we assess procedural unconscionability and substantive unconscionability independently."); <u>Nat'l Fin. Servs., L.L.C. v. Mahan</u>, 19 So.3d 1134, 1136-37 (Fla. 3d Dist. Ct. App. 2009) ("Because the arbitration provisions in this case suffered from no procedural malady, we do not reach the question of substantive unconscionability."); <u>Belcher v. Kier</u>, 558 So.2d 1039, 1045 (Fla. 2d Dist. Ct. App. 1990) (stating "the court must view unconscionability in a two-pronged approach, i.e., procedural unconscionability and substantive unconscionability" and "because the appellees were unable to carry their burden as to both prongs, the ruling in their favor cannot stand."); <u>see also</u> <u>Hialeah</u>, __ So.2d __, 2009 WL 187584, at *5 n.4 ("Speaking for himself, the writer of the opinion suggests that in an appropriate future case, this court should reconsider <u>Murphy v. Courtesy Ford, L.L.C.</u>, 944 So.2d 1131 (Fla. 3d Dist. Ct. App. 2006) . . . . Although the requirement for **both** procedural and substantive unconscionability has been repeated in a number of arbitration cases in recent years, I respectfully suggest that holding is (a) illogical, and (b) inconsistent with this court's decision in <u>Steinhardt v. Rudolph</u>, 422 So.2d 884 (Fla. 3d Dist. Ct. App. 1982).") (Cope, J.).[14]

---

[14]In <u>Golden v. Mobil Oil Corp.</u>, involving a commercial lease, this Court recognized that Florida's Third District Court of Appeal in <u>Steinhardt</u> "reject[ed the] procedural-substantive

33

As a result of this tension, there is a question as to the analytical method – balancing, sliding scale or independent analysis – courts should use in considering procedural and substantive unconscionability issues under Florida law, which we conclude should be certified to the Florida Supreme Court.

## C.      Procedural Unconscionability

Whatever the approach used, it also is not clear whether Sprint's contract with the Plaintiff is procedurally unconscionable under Florida law.  To determine whether a contract is procedurally unconscionable under Florida law, courts must look to: (1) the manner in which the contract was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract. Powertel, 743 So.2d at 574; Murphy, 944 So.2d at 1134.  Under Florida law, a

---

analysis as a rule of law, but not[ed] that it is 'generally helpful.'"  882 F.2d at 493.  Golden concluded that "[w]e need not decide whether the transaction . . . was procedurally unconscionable because we hold that the limitation of liability clause was not substantively unconscionable."  Id. at 493-94.  However, several Florida intermediate appellate decisions, after Golden was decided in 1989, adhere to a strict procedural-substantive analysis, do not appear to follow Steinhardt, and establish a lack of clarity in Florida law.

     "If state law changes or is clarified in a way that is inconsistent with the state law premise of one of our earlier decisions, the prior panel precedent rule does not bind us to follow our earlier decision."  United States v. Johnson, 528 F.3d 1318, 1320 (11th Cir. 2008).  This is yet another reason why we certify the questions in this case to the Florida Supreme Court.

34

central question in the procedural unconscionability analysis is whether the consumer has an absence of meaningful choice in whether to accept the contract terms. Belcher, 558 So.2d at 1042. In addition, Florida courts "might find that a contract is procedurally unconscionable if important terms were hidden in a maze of fine print and minimized by deceptive sales practices." Powertel, 743 So.2d at 574 (quotation marks omitted).

Here, the district court determined that Plaintiff had a meaningful choice and that Sprint's class action waiver was not procedurally unconscionable because Plaintiff had notice of the class action waiver when he executed the 2005 Advantage Agreement, could have rejected the class action waiver within 14 days of signing his 2005 agreement, could have used other mobile phone carriers (while keeping the same phone number) without signing a class action waiver, and was not prohibited from changing to an alternate provider due to the cost of lost equipment (the Sprint-only mobile phone).

On appeal, Plaintiff relies primarily on the First District's Powertel case to argue that the Sprint class action waiver is procedurally unconscionable. In Powertel, the Florida First District Court of Appeal invalidated an arbitration clause in a cellular phone service contract. Powertel, 743 So.2d at 572. The Florida appellate court determined the arbitration provision was unconscionable

because (1) the plaintiff lacked any meaningful choice in the matter, and (2) cancelling the contract was not an effective remedy since it would cause the loss of purchased equipment that worked only with Powertel's network and the plaintiff's telephone number could not be transferred to a new provider. Id. at 575. The Florida appellate court added that its procedural unconscionability determination was supported by deficiencies in the way Powertel notified its customers of the revised "Terms and Conditions of Service," including small print, no clear way to know what provisions were changed, and nothing to indicate it contained anything new. Id.[15] The Florida appellate court concluded "the method Powertel employed may have left many customers unaware of the new arbitration clause." Id.

In contrast, Florida's Fourth District Court of Appeal concluded in Fonte v. AT&T Wireless Services that the arbitration clause/class action waiver in a mobile phone contract was not procedurally unconscionable. Fonte, 903 So.2d at 1025-26.

---

[15]A subsequent Second District Court of Appeal decision stated that the "take it or leave it" nature of the cellular contract modification in Powertel was key to its procedural unconscionability. Orkin Exterminating Co., Inc. v. Petsch, 872 So.2d 259, 265 (Fla. 2d Dist. Ct. App. 2004) ("The agreement in Powertel was, without question, procedurally unconscionable. Powertel, a cellular service provider, attempted to modify its contracts with customers after the fact, by including an insert in the customer's bill stating the terms of the existing contracts would be changed to add an arbitration provision as of a certain date. If the customer continued to use the cellular service, he or she was deemed to have accepted the new contract terms . . . . Powertel's customers had no choice but to agree to the new arbitration clause if they wished to continue to use the cellular telephone plans they had already purchased.") (emphasis added).

36

The Fonte plaintiff executed an AT&T wireless contract and, at the time of the initial contract, received AT&T's terms and conditions, which included arbitration and class action waiver clauses similar to the provisions in this case. See id. at 1021-24. Although suggesting the arbitration clause might be an adhesion contract,[16] the Florida appellate court in Fonte concluded the clause was not procedurally unconscionable, distinguishing Powertel. Id. at 1026-27. The Fonte court stated: "Contrary to the manner in which the arbitration clause in Powertel was imposed, AT&T included the arbitration clause in the original contract and notified [the plaintiff] numerous times to carefully review the Terms and Conditions, . . . [and the plaintiff] had no prior investment in AT&T equipment . . . ." Id. at 1026-27. The Florida court also noted that the plaintiff in Fonte was free to choose any alternate wireless carrier. Id. at 1027.

The parties cite several other Florida intermediate appellate decisions discussing procedural unconscionability. Each depends highly on the particular facts of the case. For example, in Murphy v. Courtesy Ford, Florida's Third

_____

[16]Plaintiff contends that Sprint's Terms and Conditions qualify as an adhesion contract under Florida law, and Sprint does not dispute this characterization. See Powertel, 743 So.2d at 574 ("Generally, an adhesion contract is defined as a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract.") (quotations omitted). The fact that a contract is one of adhesion is significant, but not dispositive, to the procedural unconscionability analysis under Florida law. Id.

37

District Court of Appeal affirmed the trial court's determination that an arbitration clause contained as part of the conditions of an automobile purchase contract was not procedurally unconscionable. Murphy, 944 So.2d at 1134-35. The Florida court reasoned that the arbitration clause appeared in the same type-face as the rest of the agreement, and there was no evidence that the automobile dealers actively discouraged or prevented the customer from understanding the terms. Id. at 1135 ("[The plaintiff] cannot avoid her contractual responsibility simply because she chose not to review the terms of her agreement."); see also Orkin Exterminating Co., 872 So.2d at 265 ("[T]he arbitration provision was contained in the original contract between the parties. It was in large type on the first page of the agreement, not buried in a maze of fine print. While it was a preprinted provision, we cannot agree with the circuit court's finding that it was a contract of adhesion.").

However, in Steinhardt v. Rudolph, Florida's Third District Court of Appeal concluded a rent escalation clause in an initial condominium lease agreement was procedurally unconscionable. Steinhardt, 422 So.2d at 886. The Florida appellate court noted several factors indicating procedural unconscionability, including the absence of individual condominium unit owners in the negotiations for rent increases, the inability of owners to opt out of the contract, and the fact that many

38

contractual documents were not provided to individual owners until after closing. Id. at 892. In Belcher v. Kier, Florida's Second District Court of Appeal concluded rental price increases for mobile home tenants were procedurally unconscionable, mostly because "the difficulties inherent in moving the home from one settled location to another" made it nearly impossible for the mobile home tenants to be in the same bargaining position as mobile home park owners. Belcher, 558 So.2d at 1042.[17] Finally, in Hialeah Automotive v. Basulto, Florida's Third District Court of Appeal determined an arbitration clause in an initial automotive sales contract was procedurally unconscionable because its terms were in English, the plaintiffs did not speak English, and the dealership's employees knew this fact and conducted the entire transaction, apart from the written agreement, in Spanish, but did not inform the plaintiffs of the arbitration clause or provide a Spanish language translation of the initial contract. Hialeah, 2009 WL 187584, at *2-3.

The facts of this case are different from all of the above Florida decisions, and it is not clear what a Florida court would do if this case were presented to it. Here, at the time Plaintiff purchased a second phone on the same account as his first phone, Plaintiff's 2005 Advantage Agreement contained the arbitration clause

---

[17]Florida's Second District Court of Appeal ultimately concluded in Belcher that the contract, although procedurally unconscionable, was not unconscionable on the whole because the rental increases were not substantively unconscionable. Id. at 1045.

and expressly referenced Sprint's separate 2004 Terms and Conditions, which contained the class action waiver in clearly understandable print and terms, as discussed later. The class action waiver remained in the 2007 and 2008 Terms and Conditions, which Sprint brought to Plaintiff's attention in monthly invoices and on its website. Plaintiff argues, however, that Sprint changed the Terms and Conditions over the course of 2001 to 2008 and did not call his attention to new provisions, such as the class action waiver, that were added in 2004.

Plaintiff stresses that once he contracted with Sprint in 2001, he could not have left Sprint for another carrier without rendering his Sprint mobile phone for his first phone line useless, as it only worked on Sprint's network.[18] Yet the evidence in the record does not show how much Plaintiff paid for his first phone in 2001, much less how much it was worth, if anything, in 2008.[19] Instead, Plaintiff asserts he "can't know these things because he never attempted to terminate his plan or sell his phone, nor are they relevant since the mere fact that such a burden exists supports the Plaintiff's unconscionability argument."

---

[18]It is undisputed that Plaintiff could have cancelled his second phone line within 14 days of signing the 2005 Advantage Agreement with no monetary penalty and with a full refund of his second phone.

[19]Plaintiff admits in his Reply Brief that he did not submit evidence regarding the 2008 value of his first phone (obtained in 2001) or the cost of replacing it. For that matter, Plaintiff has submitted no evidence of the purchase price or 2008 value of any of the mobile phones he used.

Plaintiff also argues he could not have effectively cancelled his service contract with Sprint because there was no equivalent alternative carrier that did not also have a class action waiver in its contracts. However, the record indicates both TracFone and Virgin Mobile offered mobile service without a class action waiver in Plaintiff's service area in 2005 when he signed the 2005 Advantage Agreement. Plaintiff claims neither carrier was an acceptable substitute because Virgin Mobile allegedly did not offer roaming services beyond the Sprint PCS network, and TracFone settled a lawsuit in 2007 for allegedly charging its customers improper roaming charges. Sprint responds that these de minimis differences from Sprint's service do not negate that TracFone and Virgin Mobile were available alternatives to the Sprint service and did not have class action waivers in 2005, and that Florida law does not require that the available alternatives are perfect substitutes for the original service.

Sprint also emphasizes, as did the district court, that Plaintiff had a 14-day period following execution of the 2005 Advantage Agreement during which he could have cancelled his Sprint services without incurring any penalty and would receive a full refund of his second phone purchase. Although Plaintiff arguably had no bargaining power as to the class action wavier in the 2005 Advantage Agreement, Sprint provided a mechanism through which Plaintiff could have

41

avoided the contract entirely. Thereafter, each time Sprint amended its terms and conditions, Plaintiff had 30 days to cancel his service without payment of any penalty fees. As to his mobile phone equipment, Plaintiff repeatedly changed mobile phone models and admits Sprint subsidized the phones for his service agreements, although he has submitted no evidence of what he actually paid for the phones. And Plaintiff's mobile phone number was required by law to be portable to other carriers.

Furthermore, the arbitration and class action clauses in this case are clearly demarcated from the rest of the document and emphasized by being in either bold, all caps, boxes, or all three. Upon review of the entire Terms and Conditions applicable in 2005, 2007, and 2008, it is apparent that if Plaintiff had read the terms and conditions he would have at a minimum noticed these arbitration and class action waiver clauses, as they are visually distinct from the rest of the contract and are relatively easy for nonlawyers to understand. E.g., ("**MANDATORY ARBITRATION OF DISPUTES** . . . . NO CLAIM . . . SHALL BE RESOLVED ON A CLASS-WIDE BASIS"); ("**Instead Of Suing In Court, We Each Agree To Arbitrate Disputes**"); ("**No Class Actions**"). And when he signed the 2005 Advantage Agreement, Plaintiff represented he had read the Terms and Conditions. This case is arguably distinct from Florida appellate

42

cases such as <u>Powertel</u>, <u>Murphy</u>, and <u>Hialeah</u> in which unconscionable clauses were found in small print or buried within agreements, or were in a language other than the language in which the plaintiff carried out a sales transaction. Nonetheless, Sprint repeatedly changed its Terms and Conditions without calling to the subscriber's attention which parts were new.

After consideration of all Florida intermediate appellate cases cited by the parties, we cannot determine whether a Florida court would find Sprint's contract under the particular facts of this case procedurally unconscionable. Given the unsettled state of Florida law, the enormous number of mobile phone contracts these days, and the frequency of these types of unconscionability claims, we conclude the question of whether Sprint's contract is procedurally unconscionable should be certified to the Florida Supreme Court.

**D.      Substantive Unconscionability**

Plaintiff also claims the class action waiver is substantively unconscionable. Under Florida law, substantive unconscionability focuses on the terms of the agreement itself and whether the terms of the contract are "unreasonable and unfair." <u>Powertel</u>, 743 So.2d at 574; <u>Kohl v. Bay Colony Club Condominium, Inc.</u>, 398 So.2d 865, 868 (Fla. 4th Dist. Ct. App. 1981); <u>accord</u> <u>Golden</u>, 882 F.2d at 493 (stating that under Florida law, "[s]ubstantive unconscionability exists when

43

the terms of the contractual provision are unreasonable and unfair").[20]  Substantive

unconscionability focuses "directly on those terms of the contract itself which

amount to an outrageous degree of unfairness to the same contracting party."

Steinhardt, 422 So.2d at 889.  Florida generally defines substantive

unconscionability in reference to an agreement "'no man in his senses and not

under delusion would make on the one hand, and as no honest and fair man would

accept on the other.'" Belcher, 558 So.2d at 1044 (quoting Hume v. United States,

132 U.S. 406, 10 S. Ct. 134 (1889)).

Plaintiff contends the waiver of the class action remedy in Sprint's Terms

and Conditions renders his contract substantively unconscionable.  Absent the

ability to bring suit as a class, Plaintiff argues (1) that his improper roaming fees

claim is too small to litigate individually; (2) he will be unable to find legal

representation because attorneys will not be able to pool plaintiffs as a class and

collect fees from the class award; and (3) thus the class action waiver effectively

---

[20]This Court in Golden noted that "Florida courts consistently have upheld the right to limit the remedies available in the event of a breach of a commercial lease agreement." Golden, 882 F.2d at 494 (citing various Florida cases).  The clause at issue in Golden did not prevent the plaintiff from recovering all damages, but limited his potential recovery to "the difference between the stipulated rent and the value of the use of the premises." Id. (quotation marks omitted).  Negotiated commercial leases are arguably different from individual consumer contracts on standard forms, and thus Golden does not answer the issue here.

bars him from bringing suit at all.[21]

Some Florida cases support Plaintiff's argument. In <u>Powertel</u>, Florida's First District Court of Appeal found an arbitration clause that "effectively remove[d] Powertel's exposure to any remedy that could be pursued on behalf of a class of consumers" substantively unconscionable in part because "the agreement requires the customers to give up other legal remedies." <u>Powertel</u>, 743 So.2d at 576 (stating, "One indicator of substantive unconscionability is that the agreement requires the customers to give up other legal remedies."). The <u>Powertel</u> court emphasized that the arbitration clause and class action waiver (1) limited the plaintiff to actual damages only, thereby precluding recovery of punitive damages; (2) "precluded the possibility that a group of its customers might join together to seek relief that would be impractical for any of them to obtain alone"; and (3) did not allow an arbitrator to provide injunctive or declaratory relief, thereby effectively forcing plaintiffs to "waive important statutory remedies" (such as those granted under FDUTPA) and "effectively insulat[ing] Powertel from liability under

---

[21]Plaintiff does not argue that the general limitation on Sprint's liability repeated in its Terms and Conditions is relevant to the Court's analysis for either procedural or substantive unconscionability. Instead, Plaintiff argues that, without the ability to litigate as a class, the possibility of a discretionary award of attorney's fees on his FDUTPA claim, pursuant to Fla. Stat. § 501.2105(1), is not a sufficient incentive for an attorney to take that claim. Plaintiff's briefing on appeal does not otherwise contest Sprint's limitations on the damages Plaintiff could receive, whether through an individual suit or class action. Indeed, no party in this appeal cites Sprint's limitation-of-damages clause.

state consumer laws." Id. at 576-77.[22]

In another case, Bellsouth Mobility LLC v. Christopher, 819 So.2d 171, 173

(Fla. 4th Dist. Ct. App. 2002), Florida's Fourth District Court of Appeal considered

the unconscionability of a class action waiver in an arbitration clause of a wireless

phone contract, stating:

> The contract on its face supports that the arbitration
> clause is, at a minimum, substantively unconscionable
> because it requires customers to give up many specific
> legal remedies. For instance, it expressly limits
> Bellsouth's liability to actual damages, even if its
> conduct rises to the level of outrageousness required to
> assess punitive damages. It also expressly removes
> Bellsouth's exposure to a class action suit which, in this
> case, may be warranted due to the numerosity of the
> small claims asserted, the common questions of law and
> fact raised by the claims, the typicality of the claims, and
> Christopher's status as a fair representative of the class.

Id. Ultimately, the Florida appellate court in Bellsouth Mobility did not hold that

---

[22]In cases under Georgia law or federal law, this Court has concluded that arbitration agreements precluding class action relief generally are valid and enforceable and not unconscionable. Caley, 428 F.3d at 1378 (Georgia law applied to employment contract); Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 877-78 (11th Cir. 2005) (Georgia law applied to consumer lending agreements); Randolph v Green Fin. Corp.-Ala., 244 F.3d 814, 819 (11th Cir. 2001) (Truth in Lending Act and federal law applied to consumer lending agreement).
       However, in Dale v. Comcast Corp., 498 F.3d 1216 (11th Cir. 2007) (Georgia law applied to cable television subscriber agreement), this Court concluded the class action waiver was unconscionable based on the specific facts and circumstances of that case, which the Dale court concluded were materially different from Caley, Jenkins, and Randolph. Id. at 1220-23. The Dale court stressed that "the enforceability of a particular class action waiver in an arbitration agreement must be determined on a case-by-case basis, considering the totality of the facts and circumstances." Id. at 1224. Thus, our precedents as to Georgia and federal law do not help much in this Florida case with its own set of unique facts.

46

the contract was substantively unconscionable because the trial court had not made sufficient evidentiary findings to support an unconscionability ruling. Id.[23]

The problem for Plaintiff in this case is that the facts here are materially different from Powertel and BellSouth Mobility, making the substantive unconscionability issue in this particular case an unsettled question under Florida law. Here, for example, Sprint's 2007 and 2008 Terms and Conditions expressly provide that Plaintiff may recover damages and attorney's fees, as authorized by the law governing his claims, in an arbitration proceeding against Sprint to the same extent as he would be able to in court. And Plaintiff makes claims under a Florida law, the FDUTPA, that specifically allows for the permissive recovery of attorney's fees and costs in civil suits. Fla. Stat. § 501.2105(1). Sprint's Terms and Conditions also do not bar declaratory or injunctive relief under FDUTPA. Cf. Powertel, 743 So.2d at 576 (stating contract was substantively unconscionable in part because plaintiff was required to waive "important statutory remedies" such as declaratory or injunctive relief under FDUTPA).

Moreover, Sprint's 2007 and 2008 Terms and Conditions provide for several

---

[23]Plaintiff also cites to several other cases from Florida or this Circuit which he contends invalidated class action waivers for substantive unconscionability. These cases are either mis-stated, mis-cited, or otherwise do not support Plaintiff's position. E.g., Reuter v. Davis, 2006 WL 3743016 (Fla. Cir. Ct. 2006) (not precedential); Am. Online v. Pasieka, 870 So.2d 170, 171 (Fla. 1st Dist. Ct. App. 2004) (no class action waiver and no discussion of unconscionability); Reeves v. Ace Cash Express, Inc., 937 So.2d 1136, 1138 (Fla. 2d Dist. Ct. App. 2006) (does not address unconscionability of class action waiver).

47

different avenues of dispute resolution in addition to arbitration. Plaintiff could have attempted to resolve his concerns informally. Or Plaintiff could have brought a qualifying claim in small claims court, for which Sprint would have covered the filing fees. The dispute resolution clause also specifically permitted Plaintiff to file disputes with federal, state, or local consumer protection agencies. And if Plaintiff chose to use the arbitration remedy, Sprint would cover administrative filing fees. In short, the only avenue taken away from the Plaintiff by the arbitration/class action waiver is a class action itself which, although providing one mechanism through which to assert several small claims, is not the only way to bring Plaintiff's small claim. It is difficult to say in these factual circumstances that no reasonable consumer would have made this agreement or that it is so unfair as to be substantively unconscionable per se. See Rivera v. AT&T Corp., 420 F. Supp. 2d 1312, 1322 (S.D. Fla. 2006) (applying Florida law and concluding class action waiver in AT&T's contract was not substantively unconscionable).[24] Nonetheless,

_____

[24]Plaintiff argues neither the Florida Attorney General's Office nor federal, state, or local consumer protection agencies would provide an effective remedy because they are overtasked and lack the resources needed to pursue vigorously small claims. Plaintiff cites to cases and briefs from Arizona, California, Washington, Massachusetts, New Jersey, and North Carolina in support of this argument. These out-of-state cases brought under different states' laws have no bearing on this case. The only case cited that involved Florida law, Rivera v. AT&T Corp., 420 F. Supp. 2d 1312 (S.D. Fla. 2006), is contrary to the Plaintiff's position. Rivera relied in part on the availability of executive enforcement of consumer protection laws to find that an arbitration provision was not substantively unconscionable. Id. at 1322 ("Because arbitration agreements precluding class-action relief are enforceable and Plaintiffs have other forums within which to seek a remedy for AT&T's allegedly unlawful billing practice, the Court finds that the CSA is

48

given our certification of the other Florida law questions, we believe the substantive unconscionability issue as to the class action waiver should be certified too.

In addition to arguing the class action waiver is substantively unconscionable, Plaintiff also contends Sprint's "changes to agreement" clause, allowing Sprint to amend its Terms and Conditions upon notice to its customers, is itself substantively unconscionable and violates Florida law. Plaintiff argues Florida law does not permit modification of contracts without new consideration and the mutual consent of the parties. Newkirk Constr. Corp. v. Gulf County, 366 So.2d 813, 815 (Fla. 1st Dist. Ct. App. 1979).

Florida law permits contract modifications if there is consent and a meeting of the minds of the initial contracting parties. Binninger v. Hutchinson, 355 So. 2d 863, 865 (Fla. 1st Dist. Ct. App. 1978). Plaintiff does not dispute Sprint's contention that its "changes to agreement" clause was agreed to in the initial terms of Plaintiff's contract (in 2001 and 2005) and was fully supported by consideration at that time. Furthermore, Sprint's right to modify the Terms and Conditions was dependent on Plaintiff's agreeing to the modifications by, inter alia, using his phone or making a payment, and Plaintiff was permitted to cancel his service

not substantively unconscionable.").

49

within 30 days of the change if he did not desire to accept the changes.

Nonetheless, given that this issue involves the same Terms and Conditions as the

other issues, we include it as well in our certification.

**E.    Plaintiff Claims Class Action Waiver Is Void**

Plaintiff's final argument is that the class action waiver is void because it

frustrates the remedial purposes of the FDUTPA.  See Fonte, 903 So.2d at 1023

(indicating there are two distinct frameworks for determining whether an

arbitration clause is unenforceable: "(1) whether the arbitration clause is void as a

matter of law because it defeats the remedial purpose of the applicable statute, or

(2) whether the arbitration clause is unconscionable"); see also Hialeah, __ So.2d

__, 2009 WL 187584, at *2 (involving automobile purchase contract and quoting

same language from Fonte).[25]  In Fonte, Florida's Fourth District Court of Appeal

examined AT&T's terms and conditions that came with its mobile phones and

applied to its wireless services.  The Florida court in Fonte concluded that although

the FDUTPA permits class action claims, "the arbitration clause's bar on class

representation does not defeat any of the remedial purposes of the FDUTPA."

---

[25]Under Florida law, a contract that frustrates the remedial nature of a consumer protection statute may be void as a matter of law.  See Fonte, 903 So.2d at 1024.  Plaintiff claims, as part of his argument for substantive unconscionability, that the class action waiver frustrates the remedial purposes of the FDUTPA.  Technically, if the class action waiver defeated the remedial purposes of the FDUTPA, it would be void under Florida law, as opposed to unenforceable for unconscionability.

50

Fonte, 903 So.2d at 1024. The Fonte court reasoned "that neither the text nor our review of the legislative history of FDUTPA suggests that the legislature intended to confer a non-waivable right to class representation." Id. at 1025.[26] In Fonte, the Florida court emphasized "there are numerous enforcement mechanisms which can protect consumers other than class actions," such as small claims court or administrative enforcement through the State Attorney's Office or the Department of Legal Affairs. Id. Although the Fonte court upheld the arbitration clause's class action waiver, it concluded "the arbitration clause's bar on an award of attorney's fees defeats a remedial purpose of FDUTPA." Fonte, 903 So.2d at 1024. After noting one remedial purpose of the FDUTPA was "to provide for the possibility of an attorney's fee award" in Fla. Stat. § 501.2105, the Florida court severed the arbitration clause's bar on attorney's fees, while upholding the arbitration clause's class action waiver.

In contrast to Fonte, Florida's First District Court of Appeal concluded in S.D.S. Autos, Inc. v. Chrzanowski, 976 So.2d 600 (Fla. 1st Dist. Ct. App. 2007), that a class action bar contained in automobile lease agreements was void because

_____

[26]See also Orkin, 872 So.2d at 261 ("When considering whether the legislature intended to preclude the submission of FDUTPA claims to arbitration . . . , 'the legislature would have to state such a requirement in unambiguous text' . . . . FDUTPA contains no such statement of legislative intent.") (quoting Aztec Med. Servs., Inc. v. Burger, 792 So.2d 617, 621, 624 (Fla. 4th Dist. Ct. App. 2001)).

51

it "effectively prevents consumers with small, individual claims based upon motor vehicle dealers' violations of section 501.976, Florida Statutes (2005), from vindicating their statutory rights under FDUTPA." Id. at 608.

The S.D.S. Autos court specifically noted that an individual asserting a successful FDUTPA claim arising out of a motor vehicle dealer's violation of the statute could recover only the attorney's fees that were reasonable in light of the individual's actual damages. Id. at 606 (citing the attorney's fees provision in Fla. Stat. § 501.976). Because individual claimants were likely to have very small recoveries, the S.D.S. Autos court reasoned, any attorney's fee award would be similarly small, effectively preventing individuals from bringing expensive cases with low actual damages. Id. at 607-08. This case does not have that concern. The regular attorney's fees provision of the FDUTPA, Fla. Stat. § 501.2105, applies, which permits recovery of attorney's fees and costs of any reasonable amount.[27] Sprint's arbitration clause does not bar attorney's fees but provides that the Plaintiff may recover in arbitration to the extent he could in court. Thus Fonte arguably is more on point for this case.

Nonetheless, given the unsettled state of Florida law, we do not decide the

_____

[27]Fla. Stat. § 501.2105(1) provides: "In any civil litigation resulting from an act or practice involving a violation of [FDUTPA] . . . , the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, may receive his or her reasonable attorney's fees and costs from the nonprevailing party."

52

issue of whether Sprint's class action waiver is void for any other reason and include this issue, too, in our certification to the Florida Supreme Court.

## III. CONCLUSION

In conclusion, the resolution of this appeal depends on unsettled questions of Florida law as to whether the class action waiver presented in this case is procedurally or substantively unconscionable or is void for other reasons. Rather than attempting an Erie "guess" as to how the Florida Supreme Court would rule on this issue, we certify the following questions to the Florida Supreme Court, pursuant to Fla. Const. art. V, § 3(b)(6). See Rando v. Gov't Employees Ins. Co., 556 F.3d 1173, 1181 (11th Cir. 2009).

(1)    Must Florida courts evaluate both procedural and substantive unconscionability simultaneously in a balancing or sliding scale approach, or may courts consider either procedural or substantive unconscionability independently and conclude their analysis if either one is lacking?

(2)    Is the class action waiver provision in Plaintiff's contract with Sprint procedurally unconscionable under Florida law?

(3)    Is the class action waiver provision in Plaintiff's contract with Sprint substantively unconscionable under Florida law?

(4)    Is the class action waiver provision in Plaintiff's contract with Sprint

void under Florida law for any other reason?

The phrasing of these certified questions should not restrict the Florida Supreme Court's consideration of the problem posed by this case. This extends to the Florida Supreme Court's restatement of the issues and the manner in which the answer is given. In order to assist consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the Florida Supreme Court.

**QUESTIONS CERTIFIED.**